BARBARA FERNANDEZ *v.* ANTONIO
DEINDE FERNANDEZ
(13283)

PETERS, C. J., HEALEY, SHEA, CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued May 3—decision released July 19, 1988

*David P. Burke,* with whom was *Alexander J. Holland,* for the appellant (defendant).

*Warner K. Depuy,* with whom were *William H. Narwold, Barbara M. Schallenberg, Roberta A. Hatch* and, on the brief, *William T. Fitzmaurice,* for the appellee (plaintiff).

*James M. Spears,* acting assistant attorney general, *Frank H. Santoro,* assistant United States attorney, and *Michael Jay Singer* and *Mark B. Stern,* filed a brief for the United States of America as amicus curiae.

PETERS, C. J. This appeal involves the applicability of the doctrine of diplomatic immunity to an action for marital dissolution and equitable property distribution. The plaintiff, Barbara Fernandez, brought this dissolution action against her husband, the defendant Antonio Deinde Fernandez. Claiming diplomatic immunity by virtue of his status as an ambassador to the United Nations for the People's Republic of Mozambique, the defendant moved to dismiss the entire action for lack of personal jurisdiction.[1] The trial court denied the motion. We granted review pursuant to General Statutes § 52-265a[2] and we now uphold the judgment of the trial court and remand for further proceedings.

The complaint in this case invokes the equitable powers of the Superior Court for a variety of purposes.

---

[1] The sole basis for the alleged lack of personal jurisdiction in this case is diplomatic immunity. The defendant raises no claim that he lacks minimum contacts with the forum state; *International Shoe Co.* v. *Washington,* 326 U.S. 310, 319-20, 66 S. Ct. 154, 90 L. Ed. 95 (1945); or that the plaintiff failed to comply with applicable statutory service of process rules. General Statutes §§ 46b-44, 46b-45 and 46b-46.

[2] "[General Statutes] Sec. 52-265a. DIRECT APPEAL ON QUESTIONS INVOLVING THE PUBLIC INTEREST. (a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the superior court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the supreme court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The chief justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice.

"(c) Upon certification by the chief justice that a substantial public interest is involved and that delay may work a substantial injustice, the trial judge shall immediately transmit a certificate of his decision, together with a proper finding of fact, to the chief justice, who shall thereupon call a special session of the supreme corut for the purpose of an immediate hearing upon the appeal.

"(d) The chief justice may make orders to expedite such appeals, including orders specifying the manner in which the record on appeal may be prepared."

Principally, the plaintiff seeks a dissolution of her marriage to the defendant on the ground of irretrievable breakdown. Incident to the dissolution, the plaintiff requests an assignment "of all of defendant's right, title and interest in certain real property located at 27 Oaley Lane, Greenwich, Connecticut." In addition, the plaintiff seeks a portion of the defendant's estate, support payments and attorneys' fees.

As this expedited appeal comes to us from the denial of a motion to dismiss, very little is known at this juncture about the parties to this suit. The complaint states that the plaintiff and defendant were married at Arlington, Virginia, on May 1, 1961. The parties allegedly separated in late 1984 or early 1985 when the defendant voluntarily left the marital home. A short time thereafter, but before the filing of the instant action, the defendant became Ambassador and Deputy Permanent Representative to the United Nations for the People's Republic of Mozambique.

At a hearing on the motion to dismiss, the plaintiff testified to the following alleged facts: The parties' three children were born in the United States and are above the age of majority. In 1974, the plaintiff and the defendant purchased real property at 27 Oakley Lane in Greenwich in the name of a Connecticut corporation, Santa Barbara Estates U.S.A., Inc. According to the plaintiff, she was the corporation's president and principal shareholder at the time of this purchase. Although the defendant traveled extensively from 1974 onward, he and the plaintiff occupied the Greenwich residence as husband and wife until his departure in late 1984 or early 1985.[3]

_____

[3] Neither the citizenship nor the current residence of the defendant is clear on the record. The plaintiff "believes" that her husband is a Nigerian citizen. As to residence, a quitclaim deed transferring the Greenwich home from corporate ownership to the defendant individually lists his abode as of October 23, 1986, as Chateau de Bois Pouillette, 284 Chemin de Crepy,

In tandem with the filing of her complaint, the plaintiff applied for an ex parte prejudgment remedy against the defendant. In a sworn affidavit accompanying her application, the plaintiff stated that the defendant is "an international businessman and diplomat" who "has admitted to being one of the richest men in Africa. He heads dozens of companies, and I believe his net worth exceeds $75 million." She further stated that, in her opinion, the defendant could easily sell or transfer assets that are relevant to her claims for relief. Of particular concern to the plaintiff was the Greenwich home where she resides with her youngest son. "This home is owned by Santa Barbara Estates U.S.A., Inc. This entity is controlled by my husband. I am afraid that my husband will use his influence to defeat my interest in the home." The trial court, *Novack, J.,* granted the application, ordering, inter alia, that the plaintiff may attach, to the value of $8,000,000, the defendant's shares in Santa Barbara Estates U.S.A., Inc.

The trial court subsequently denied the defendant's motion to dismiss the action. Although the court found that the defendant is a bona fide diplomat entitled to whatever protection international law affords, it rejected the defendant's claim of diplomatic immunity for two reasons. The court first held that the Superior Court has plenary jurisdiction over the defendant and his assets because the instant action is a "family relations" matter and not a "civil" action. Only the filing of a "civil"[4] action against diplomats is barred by the

Pont Pois 60700, Pont Ste. Maxence, France. Alternatively, the plaintiff's application for order of notice cites the following potential residences: (1) 11310 Lilting Lane, Singing Woods, Fairfax Station, Fairfax, Virginia; (2) Concorde de Crillon Hotel, 10 Place De La Concorde, Paris, France; or (3) 8 Rue Nueve DuMoland, Geneva, Switzerland.

[4] Article 31 of the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95 (done at Vienna April 18, 1961, entered into force for the United States December 13, 1972), provides: "1. A diplomatic agent shall enjoy immunity from the criminal jurisdiction of

Vienna Convention on Diplomatic Relations.[5] Alternatively, the court held that it at least had the authority to dissolve the marriage because of its in rem jurisdiction over the marital status of the parties. Even if the instant action is "civil" and the Convention applies, the court held that Connecticut law gave it the power to enter a valid dissolution order without having personal jurisdiction over the defendant. *Litvaitis* v. *Litvaitis*, 162 Conn. 540, 545, 295 A.2d 519 (1972). This latter holding dealt only with marital status; the court did not address the question of its authority to grant the plaintiff's claims for property distribution incident to dissolution.

After the filing of this appeal, the People's Republic of Mozambique executed a limited waiver, as is its prerogative under Article 32[6] of the Convention, permit-

---

the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of: (a) a real action relating to private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission; (b) an action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person and not on behalf of the sending State . . . ."

[5] The defendant enjoys diplomatic immunity in accordance with the agreement between the United States and the United Nations, Agreement Regarding the Headquarters of the United Nations, June 26, 1947, 61 Stat. 3416, T.I.A.S. 1676, 11 U.N.T.S. 11. Section 15 of the Headquarters Agreement provides in relevant part that "[e]very person designated by a Member . . . as a resident representative with the rank of ambassador . . . shall . . . be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as it accords diplomatic envoys accredited to it." While not affording protection of its own, the Headquarters Agreement incorporates the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95. In accordance with the Diplomatic Relations Act, any action barred by the immunity provisions of the Vienna Convention "shall be dismissed." 22 U.S.C. § 254d (1982). Throughout this opinion, we refer to the Headquarters Agreement, the Vienna Convention and the Diplomatic Relations Act as simply the "Convention" or the "treaty."

[6] Article 32 of the Convention provides: "1. The immunity from jurisdiction of diplomatic agents and of persons enjoying immunity under Article

ting the Superior Court "to enter an order dissolving the marital status only" between the plaintiff and the defendant.[7] Accordingly, a remand to the trial court for an adjudication of the marital status question will be necessary regardless of the outcome of this appeal. The only question before us is whether, on remand, the

37 may be waived by the sending State. 2. Waiver must always be express. 3. The initiation of proceedings by a diplomatic agent or by a person enjoying immunity from jurisdiction under Article 37 shall preclude him from invoking immunity from jurisdiction in respect of any counter-claim directly connected with the principal claim. 4. Waiver of immunity from jurisdiction in respect of civil or administrative proceedings shall not be held to imply waiver of immunity in respect of the execution of the judgment, for which a separate waiver shall be necessary."

We note, in addition, the representation of the amicus curiae United States that the defendant's diplomatic status is currently under review by the Department of State.

[7] The full text of the waiver provides: "LIMITED WAIVER OF IMMUNITY

"Pursuant to Article 32 of the Vienna Convention on Diplomatic Relations, the People's Republic of Mozambique hereby waives the immunity extended by the United States of America to Ambassador Antonio Deinde Fernandez under the provisions of the Vienna Convention on Diplomatic Relations to the following limited and restricted extent only, viz: to permit the Superior Court for the Judicial District of Stamford/Norwalk at Stamford, Connecticut, U.S.A. to enter an order dissolving the marital status only between Ambassador Antonio Deinde Fernandez and his wife, Barbara J. Fernandez, in a civil action presently pending in said Court, encaptioned *Fernandez* v. *Fernandez*, docket number FA-87-0085485-S. This limited and restricted waiver of diplomatic immunity does not encompass, and shall not be construed as encompassing, any waiver whatsoever of Ambassador Antonio Deinde Fernandez' diplomatic immunity under said Vienna Convention on Diplomatic Relations from *in personam, in rem* or any other type of jurisdiction whatsoever with respect to his person or property or any property in which he may have or claim to have an ownership interest including, without limiting the generality of the foregoing, his immunity from any awards of property and/or alimony that might otherwise be appropriate in any such matrimonial proceeding. The limited purpose of this waiver of diplomatic immunity is solely to permit the marital status only between the parties to be dissolved without Mrs. Fernandez having to institute an action for divorce in the People's Republic of Mozambique.

The People's Republic of Mozambique

By: _____"

trial court will have any authority to award the real and personal property the plaintiff claims in her complaint.

The defendant urges us to answer this question in the negative for two reasons. He first maintains that the trial court erred in exempting this "family relations" action from the scope of "civil" proceedings defined by the Convention. Citing treaty history, prior judicial decisions and general principles of diplomatic immunity, he claims that the trial court's restrictive view is contrary to international law and illustrates the type of parochialism that the Convention meant to eliminate. Second, the defendant claims that the instant action does not come within the express exception to diplomatic immunity that permits the filing of "a real action relating to private immovable property" owned by a diplomat. According to the defendant, this action is merely a divorce proceeding that could have ancillary consequences on real property; even if the in rem exception applies, the real estate at issue is exempt under a further Convention provision that immunizes the "private residence" of a diplomat. We agree with the first but not with the second of these claims.

## I

We agree with the defendant that the instant action is "civil" for purposes of establishing immunity under the Convention. As a matter of municipal[8] law, "[a]n action for a divorce or a legal separation obviously is a civil action." *Smith* v. *Smith,* 150 Conn. 15, 19, 183 A.2d 848 (1962). General Statutes § 46b-45 leaves no doubt that "[a] proceeding . . . for . . . dissolution of marriage . . . shall be commenced by the service and filing of a complaint as in all other civil actions in

---

[8] In the context of international law, the term "municipal" refers to a nation or state, not the narrower entity of a city or town. Black's Law Dictionary (Rev. 4th Ed. 1968) p. 1169.

the superior court . . . ." The plaintiff's reliance on *Chieppo* v. *Robert E. McMichael, Inc.,* 169 Conn. 646, 363 A.2d 1085 (1975), is unavailing. In *Chieppo,* we held that an appeal to the Superior Court from a workers' compensation proceeding is not a "civil action" within the meaning of the transfer statute then in effect. A key basis for this conclusion was that the legislature had created a special regime for the informal and expeditious resolution of compensation claims. Id., 651–54. There is no similar comprehensive administrative scheme relating to domestic relations. Contrary to the plaintiff's suggestion and the trial court's conclusion, the mere existence of separate Practice Book provisions pertaining to family matters does not rebut the strong inference, flowing from § 46b-45 as well as from *Smith* v. *Smith,* supra, that divorce proceedings are "civil" actions under Connecticut law.

Even if municipal law were equivocal on this question, controlling principles of international law dictate that the instant claim is a "civil" action. Article 31 of the Vienna Convention provides that a "diplomatic agent shall enjoy immunity from the . . . civil and administrative jurisdiction" of the receiving state. The negotiating history of the Convention supports a broad reading of this language. Sir Gerald Fitzmaurice, the special rapporteur who drafted the Convention under the auspices of the International Law Commission, explained that he "could not imagine a proceeding which would not fall under one of the three jurisdictions—criminal, civil and administrative." 1 Y.B. Int'l L. Comm'n 147 (1958). Further, the record reveals an explicit awareness by the drafters that marital dissolution proceedings were prohibited by the Convention. One drafter noted that "[t]he immunity of the diplomatic agent was maintained even in the . . . matter of divorce, because a divorce action under the local

jurisdiction was incompatible with his dignity as a diplomat." 1 Y.B. Int'l L. Comm'n. 97 (1957).

We therefore conclude that the trial court's assertion of jurisdiction under the aegis of "family relations" was erroneous. See also *Shaw* v. *Shaw,* 3 All E.R. 1, 3, 3 W.L.R. 24 (1979) (construing Article 31 to bar divorce proceedings against an accredited diplomat). Our conclusion is consistent with case law in effect in this country prior to the entry into force of the Convention in 1972. In *Carrera* v. *Carrera,* 174 F.2d 496, 498 (D.C. Cir. 1949), and *Tsiang* v. *Tsiang,* 194 Misc. 259, 260, 86 N.Y.S.2d 556 (1949), the courts dismissed actions for marital separation on grounds of diplomatic immunity. Article 31 and its negotiating history therefore affirm the general principle that the Vienna Convention was meant to codify existing rules of customary international law. E. Denza, Diplomatic Law— Commentary on the Vienna Convention on Diplomatic Relations (1976) p. 1. Prior decisions such as *Carrera* and *Tsiang* are strong evidence of the intent of the drafters of the Convention and the consequent meaning of Article 31 itself. Accordingly, the trial court erred in finding that this was not a "civil" matter and that it had plenary power to adjudicate all facets of this case.

## II

Article 31 of the Convention immunizes a diplomatic agent from the civil jurisdiction of the receiving state "except in the case of: (1) a real action relating to private immovable property situated in the territory of the receiving state, unless he holds it on behalf of the sending State for the purpose of the mission." The question that we must resolve is whether the plaintiff's claim to the title of the Greenwich home and real estate is cognizable under this exception to the rule of diplomatic immunity.

It is true, as the defendant emphasizes, that the plaintiff's claim arises in the context of a marital dissolution action. It is also true, as we noted earlier in this opinion, that such actions are normally barred by a diplomat's immunity from the "civil" process of the receiving state. It is not necessarily true, however, that the generalized immunity conferred by the treaty prevails over the specific language of the in rem exception. To the contrary, we believe the in rem exception, as a particularized recognition of the receiving state's special interest in its land, reflects an intent to limit the generalized protection of Article 31 of the Convention. Whether such a result is mandated in the circumstances of this case depends on the precise meaning of the phrase "real action relating to private immovable property." Since the plaintiff has raised a bona fide question regarding the applicability of the in rem exception, we must interpret the Convention as a whole to determine whether her claim is meritorious.

Before turning to the ultimate issue, however, we are mindful that, but for diplomatic immunity, the plaintiff's claim for real property incident to marital dissolution would readily be entertained by our courts. Domestic relations is "an area that has long been regarded as a virtually exclusive province of the States." *Sosna* v. *Iowa,* 419 U.S. 393, 404, 95 S. Ct. 553, 42 L. Ed. 2d 532 (1975); *Carabetta* v. *Carabetta,* 182 Conn. 344, 346, 438 A.2d 109 (1980). This plenary state power encompasses not only the regulation of marital status, but also the distribution of property and protection of offspring. *Williams* v. *North Carolina,* 317 U.S. 287, 298–99, 63 S. Ct. 207, 87 L. Ed. 279 (1942). Federal courts decline to exercise jurisidiction over petitions for divorce or alimony, even where diversity of citizenship exists, out of respect for this zone of state authority. *Ohio ex rel. Popovici* v. *Agler,* 280 U.S. 379, 383–84, 50 S. Ct. 154, 74 L. Ed. 489 (1930);

*Barber* v. *Barber,* 62 U.S. (21 How.) 582, 16 L. Ed. 226 (1859). The plaintiff's claim for title to Connecticut real estate also invokes this state's "strong interests in assuring the marketability of property within its borders and in providing a procedure for peaceful resolution of disputes about the possession of that property . . . ." *Shaffer* v. *Heitner,* 433 U.S. 186, 208, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977).

It is nevertheless a basic tenet of treaty law that binding agreements are to be respected and enforced ("pacta sunt servanda"). M. Janis, An Introduction to International Law (1987) pp. 8–11. In particular, the state interest in furnishing a judicial forum in this case is subject to the supremacy of a binding treaty commitment of the United States government. U.S. Const., art. VI, § 2; *United States* v. *Belmont,* 301 U.S. 324, 331, 57 S. Ct. 758, 81 L. Ed. 1134 (1937); *Missouri* v. *Holland,* 252 U.S. 416, 434, 40 S. Ct. 382, 64 L. Ed. 641 (1920). In giving priority to a binding treaty, we must interpret the treaty in good faith in accordance with the ordinary meaning of its terms and in the light of its object and purpose. 1 Restatement (Third), The Foreign Relations Law of the United States (1987) § 325. "Interpretation . . . must, of course, begin with the language of the Treaty itself. The clear import of the treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.' " *Sumitomo Shoji America, Inc.* v. *Avagliano,* 457 U.S. 176, 180, 102 S. Ct. 2374, 72 L. Ed. 2d 765 (1982).

Article 31 clearly sets forth an exception to diplomatic immunity for any "real action relating to private immovable property." The concept of excluding actions relating to real property from the scope of diplomatic immunity was firmly entrenched prior to the adoption of the Convention. See generally 2 Y.B. Int'l L.

Comm'n 78, 98 (1958); E. Denza, supra, pp. 154–56; C. Wilson, Diplomatic Privileges and Immunities (1967) p. 107; B. Sen, A Diplomat's Handbook of International Law and Practice (2d Ed. Rev. 1979) p. 111; *Anonymous* v. *Anonymous,* 44 Misc. 2d 14, 19, 252 N.Y.S.2d 913 (1964). In a position paper prepared in 1961 for the United States delegation to the negotiating conference for the Convention, the Department of State recognized the historic validity of the real property exception: "It is axiomatic that real property other than that owned by the sending State and used for diplomatic purposes, is within the exclusive jurisdiction of the state in which it is located. Moreover, since actions respecting real property are usually *in rem,* it cannot be argued that an action affecting real property held by a diplomatic agent for non-diplomatic purposes will interfere with the proper performance of his diplomatic functions." 7 M. Whiteman, Digest of International Law (1970) p. 407.

Turning to the specific meaning of the treaty in this case, we face a question of first impression concerning the intended scope of the language of the exception. The parties submit divergent interpretations. According to the plaintiff, her claim for ownership of the Greenwich home, even though it arises in the context of a dissolution proceeding, falls within the plain meaning of the exception. The defendant, on the other hand, argues that the plaintiff's position, if adopted, would eviscerate the treaty. He maintains that a litigant could evade the broad immunity of the treaty by attaching the real property of a diplomat in order to satisfy an unrelated *in personam* judgment. Such a maneuver would, according to the defendant, enable a litigant to "alchemize" a run-of-the-mill tort dispute into one "relating to private immovable property" within the meaning of the treaty, thereby defeating the intent of the signatories.

We are persuaded by the plaintiff that the treaty allows her claim for ownership of the family residence to be heard in this case, in which the sending state has waived any claim of immunity with regard to the dissolution of the marriage.[9] We rely on two principal grounds for our conclusion. First, the language of the exception eschews any technical focus on the *form* of action brought and instead raises the sole question of whether the real property is *itself* the disputed object of the litigation. Despite the absence of published cases construing the provision or any discussion by the drafters of the meaning of "real action," we are not entirely without interpretive guidance. A leading commentator has defined the exception thus: "The essence of the term 'real action' is that the relief sought is either a declaration of title to the property, an order for sale by authority of the court, or an order for possession. The term is used in the sense of an action in rem . . . . " E. Denza, supra, pp. 159–60. An identical conclusion was reached by a second commentator: "[A] real action is an action where ownership or possession of immovable property is claimed." E. Satow, Guide to Diplomatic Practice (5th Ed. 1979) § 15.13, p. 125.

The express terms of the treaty, as construed, thus support a conclusion that the Superior Court has jurisdiction over the defendant for the purpose of adjudicating the plaintiff's claim of ownership of the Greenwich home. The very object and purpose of the plaintiff's complaint is a vindication of her claimed right of ownership of the real estate. The substance of her claim is that she is entitled to the home as an immediate and

[9] We need not decide whether Connecticut would in any case have jurisdiction to dissolve a Connecticut marriage that, in its entirety, antedated the assumption of ambassadorial status. Furthermore, we need not decide whether the trial court's in rem jurisdiction, which is ancillary to its jurisdiction over the status of the marriage, would continue if the sending state's waiver were to be withdrawn.

essential consequence of her marital dissolution. This is simply not a case where the plaintiff seeks to satisfy a collateral judgment in her favor by forcing the sale or transfer of unrelated real property. Under the latter circumstances, the defendant's concern for the evisceration of the treaty might be well-founded. When the complaint alleges a direct right of ownership of the thing itself, however, such a concern finds no basis in law or fact.

Second, the overriding emphasis of the Convention is functional. The preamble states the general principle that "the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of the diplomatic missions." The functional approach of the Convention is a departure from the two classical theories of diplomatic immunity. One theory posited that the diplomat was the personification of the sending state and therefore entitled to the highest dignity. Another theory rested on the legal fiction that the diplomat was always on the soil of the sending state, wherever he or she might actually go, and therefore was extraterritorially immune from process. See generally B. Sen, supra, pp. 80–81; C. Wilson, supra, pp. 1–16. Both theories contained an inflexible presumption of immunity for protected diplomats.

The Vienna Convention, on the other hand, adopted a theory that justifies immunity by the need to safeguard the actual functioning of the diplomatic mission. C. Wilson, supra, pp. 17–25. "The functional approach is not merely an academic rationale. During the formulation of the Vienna Convention it guided the makers at every crucial point. The general result was to tighten the protection given to the mission itself—its premises, its communications, its property, its archives and the inviolability of its senior members." E. Denza, supra, p. 5. Although we do not view the functional approach

as an open invitation to disregard the doctrine of diplomatic immunity, the Convention itself imposes limitations on the scope of immunity in order to minimize abuse.

This functional theory had a specific ramification in the drafting of the in rem exception. "[A] real attempt has been made to strike a balance between the need to protect a diplomat in regard to official matters and to guard him from the harassment of frivolous lawsuits and the conflicting need to minimise abuse of immunity by diplomats in regard to matters which have nothing to do with their job and to provide a forum for those cases involving land where a plaintiff might otherwise have no other." E. Denza, supra, p. 4. The drafters' sense of balance is reflected by the narrow scope of the in rem exception. It does not expose to municipal jurisdiction any real property held by the diplomat "on behalf of the sending State for purposes of the mission"; Vienna Convention, Article 31 (a); or the "private residence of a diplomatic agent." Id., Article 30 (1). The exception thus represents a studied effort by the drafters to balance the competing factors of national sovereignty over land and diplomatic inviolability.

On remand, then, it is for the trial court to determine whether to grant the plaintiff title to the disputed real property. The defendant argues that his interest in the family home is immune from jurisdiction as the "private residence of a diplomatic agent" pursuant to Article 30 of the Convention.[10] On the record before us, we are unable to resolve this claim. The trial court made no findings of fact on the question of whether the defendant continues to maintain his "private residence"

---

[10] Article 30 of the Convention provides: "1. The private residence of a diplomatic agent shall enjoy the same inviolability and protection as the premises of the mission. 2. His papers, correspondence and, except as provided in paragraph 3 of Article 31, his property, shall likewise enjoy inviolability."

at the Greenwich home. It is possible that the defendant vacated the home not intending to return and therefore no longer resides there. See, e.g., *Agbor* v. *Metropolitan Police Commissioner,* 2 All E.R. 707, 1 W.L.R. 703 (1969). We, of course, express no view on the merits of this factual question.[11]

### III

The final question is whether, on remand, the trial court will have authority to award the plaintiff support payments and whatever ancillary monetary relief seems appropriate. In support of jurisdiction over her claims, the plaintiff relies not on a specific treaty provision, as was the case regarding real property, but instead on her alleged due process right of access to a judicial forum for a resolution of all disputes arising out of a marital dissolution. She maintains that the residual immunity conferred upon the defendant in this case must give way to her right of access guaranteed by the fourteenth amendment to the United States constitution. See *Boddie* v. *Connecticut,* 401 U.S. 371, 377–79, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971).[12]

This claim raises serious concerns about the interrelationship of two equally valid federal laws: constitutional principles safeguarding individual rights and treaty provisions preserving the inviolability of diplomatic agents. As a general rule, a treaty provision that contravenes "any of the prohibitions or limitations of

---

[11] The dissent suggests a ground for jurisdiction that was not argued by either party in this court. In our view, we lack either a factual or legal basis for exploring it in this case.

[12] Because of the limited waiver in this case, we do not consider the further claim that *Boddie* gives the plaintiff a constitutional right of access to obtain a divorce that would take priority over the general immunity of the Convention. If the sending state were to withdraw its waiver or our interpretation of the real property exception were deemed erroneous, this difficult question would have to be addressed.

the Constitution applicable to the exercise of authority by the United States" is null and void. 1 Restatement (Third), The Foreign Relations Law of the United States (1987) § 302 (2). The United States Supreme Court has "regularly and uniformly recognized the supremacy of the Constitution over a treaty." *Reid* v. *Covert,* 354 U.S. 1, 17, 77 S. Ct. 1222, 1 L. Ed. 2d 1148 (1957). The reason for this rule is that the federal government, as a creature of the constitution, must exercise its authority within the limitations proscribed by its charter. Id., 16–17.

Presumably, the right enunciated in *Boddie,* which springs from the due process clause of the fourteenth amendment, applies against the federal government through the due process clause of the fifth amendment. *Boddie* thus constitutes, in the language of the Restatement, a limitation "applicable to the exercise of authority by the United States." We nevertheless face a troubling uncertainty as to the scope of *Boddie:* Does the right of access to dissolve a marriage include the right of access to obtain proprietary relief incident to divorce? We think not. The focus of the Supreme Court in *Boddie* was squarely on the "fundamental human relationship" of marriage. *Boddie* v. *Connecticut,* supra, 383. "The denial of access to the judicial forum in *Boddie* touched directly . . . on the marital relationship and on the associational interests that surround the establishment and dissolution of that relationship." *United States* v. *Kras,* 409 U.S. 434, 444, 93 S. Ct. 631, 34 L. Ed. 2d 626 (1973). The plaintiff offers no direct authority to the contrary and we have found none. We therefore decline to expand the holding of *Boddie* beyond its factual boundaries of the marital status. Accordingly, no conflict exists between the federal constitution and the Vienna Convention in this case.

There is no error and the case is remanded to the trial court for further proceedings in accordance with this opinion.

In this opinion CALLAHAN, GLASS, COVELLO and HULL, Js., concurred.

SHEA, J., with whom HEALEY, J., joins, dissenting in part. I agree with the majority that the trial court had jurisdiction to adjudicate and protect the present interest of the plaintiff in the Greenwich residence, assuming that the property does not qualify as the "private residence of a diplomatic agent," a factual issue yet to be determined in the trial court. I disagree, however, with the implications of the majority opinion that the court upon remand would have jurisdiction to transfer to the plaintiff all or part of the defendant's interest in the residence simply because her claim of a present interest in that real estate is joined with her claim for a dissolution of her marriage. I also would find error in the failure of the trial court to dismiss all of the plaintiff's claims for relief that specifically invoke the authority of the court under our marital dissolution statutes to assign property and to grant other relief as adjuncts to a marital dissolution.

I

The majority opinion appears to concede[1] that the plaintiff's action for dissolution of her marriage, at the time the trial court denied the defendant's motion to dismiss, was barred by the Vienna Convention on Diplomatic Relations, because "the record reveals an explicit

---

[1] In Part III of the majority opinion the claim of the plaintiff that she has a right of access to the courts under the fourteenth amendment to the United States constitution for the purpose of dissolving her marriage, relying upon *Boddie* v. *Connecticut*, 401 U.S. 371, 377–79, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971), is rejected insofar as the plaintiff asserts that right as a basis for the additional relief she seeks as an adjunct to the dissolution. Because the waiver of diplomatic immunity in respect to the dissolution itself makes it unnecessary to decide whether *Boddie* has created a constitutional right to a dissolution of marriage, absent the element of discrimination against the poor that was present in that case, the majority opinion has left the constitutional question unresolved.

awareness by the drafters that marital dissolution proceedings were prohibited by the Convention." The fact that, after the appeal was filed, a limited waiver of the defendant's diplomatic immunity was executed to permit only dissolution of the marital status of the parties renders that determination of the trial court moot. Because the waiver is effective only for the purpose of dissolving the marriage, however, it cannot serve as a vehicle upon which to predicate any of the relief normally attendant upon a dissolution of marriage under our statutes.

The prayer for relief of the complaint in this action seeks, in addition to a dissolution of the marriage, the following remedies: (1) "[a]n assignment of a portion of the defendant's estate in accordance with [General Statutes] § 46b-81"; (2) "[a]n assignment to the plaintiff of all of defendant's right, title and interest in certain real property located at 27 Oakley Lane, Greenwich, Connecticut, pursuant to [General Statutes] § 46b-81"; (3) "[r]easonable support pursuant to [General Statutes] § 46b-82"; (4) "[r]easonable attorney's fees in accordance with [General Statutes] § 46b-62"; and (5) "[s]uch other, further, and different relief as the court may deem proper." This cornucopia of demands appears to have been overlooked by the majority in declaring that "[t]he very object and purpose of the plaintiff's complaint is a vindication of her claimed right of ownership of the real estate."

As I understand the majority opinion, however, it concludes that the only relief a court of this state has jurisdiction to grant, in view of the assertion of the defendant's immunity even as modified by the waiver, is that which would be appropriate under the exception in the Convention for "a real action relating to private immovable property." Since the only immovable property of the defendant in this state disclosed by the record is the residence in Greenwich occupied by both

parties until the defendant's departure, the jurisdiction of the trial court under the "real action" exception would necessarily be limited to adjudicating the present interests of the parties in that real estate. Accordingly, as the majority opinion holds, the plaintiff's claims with respect to any other property of the defendant or for such monetary relief as alimony under General Statutes § 46b-82 or attorney's fees under General Statues § 46b-62, cannot be pursued in this state. Thus, even under the majority view, the prayers seeking such relief should be dismissed because the court has no jurisdiction over the defendant to grant such relief.

The majority opinion, referring to the Greenwich residence, declares that "[t]he substance of [the plaintiff's] claim is that she is entitled to the home as an immediate and essential consequence of her marital dissolution." Because the restricted waiver of the defendant's immunity permits only the dissolution of the marriage, however, I believe the power of the court under the "real action" exception to determine the interests of the parties in the residence cannot be deemed to include the authority given under General Statutes § 46b-81 to a court when dissolving a marriage to "assign to either the husband or the wife all or any part of the estate of the other," which the plaintiff has expressly invoked in her prayer for relief, as the quotation from the majority opinion implies. The authority to transfer property of one spouse to another under § 46b-81 is plainly limited to actions for dissolution or annulment of marriage or for legal separation. The court, "[i]n fixing the nature and value of the property, if any, to be assigned," is directed to consider "the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income." If the court were

to exercise the authority to assign the defendant's interest in the residence to the plaintiff pursuant to § 46b-81, as she seeks, the concern of the Convention that the immunity of a diplomat be preserved in a divorce action because such a proceeding "under the local jurisdiction was incompatible with his dignity as a diplomat" would be wholly frustrated. 1 Y.B. Int'l L. Comm'n 97 (1957).

As her claim is summarized in the majority opinion, the plaintiff maintains "that she is entitled to the home as an immediate and essential consequence of her marital dissolution." She would, however, be barred by the Convention and the limited terms of the defendant's waiver from enhancing whatever interest in the residence she may presently possess by relying upon the circumstance that the adjudication of the interests of the parties may be made in the context of a marital dissolution proceeding. In my view, therefore, the plaintiff's claim for the relief of "an assignment of all of the defendant's interest in [the residence] pursuant to Conn. Gen. Stat. § 46b-81" should be dismissed as beyond the jurisdiction of the court when diplomatic immunity has been raised, together with her other claims for relief that are unrelated to the residence, which the majority opinion concedes are not viable in this state.

## II

The complaint in this action contained, in addition to standard allegations relating to the dissolution of the marriage, the following paragraph: "The parties are the equitable and beneficial owners of real property located at 27 Oakley Lane in Greenwich, Connecticut." The prayer for relief, which contains separate claims for specific statutory remedies as adjuncts to the dissolution, also includes a claim for general equitable relief.

An affidavit of the plaintiff filed in support of her application for a prejudgment remedy asserts that the

Greenwich residence is owned by a Connecticut Corporation, Santa Barbara Estates U.S.A., Inc. At the hearings on the defendant's motion to dismiss, the plaintiff testified that in 1974, when the home was purchased, she was the majority shareholder of the corporation. She also testified that in 1986, without her knowledge and consent, the defendant had managed to have title to the residence transferred to his name. This testimony lends some substance to the allegation of the complaint that the plaintiff has an equitable interest in this real estate for which the complaint may be construed to seek an adjudication under the general equitable powers of the court, quite apart from the remaining allegations and prayers for relief that relate wholly to the dissolution action. The complaint, therefore, may be viewed to include a claim for a "declaration of title to the property" with attendant equitable relief that undoubtedly would qualify under the Convention as "a real action relating to private immovable property." E. Denza, Diplomatic Law—Commentary on the Vienna Convention on Diplomatic Relations (1976) pp. 159–60. Although the assertion of this claim as an independent ground upon which to proceed against the defendant would have been more readily apparent had it not been intermingled with the claims that are related solely to the dissolution, the jurisdiction of the court does not depend on the niceties of pleading. "It is the fact of jurisdiction, not the way in which it is made to appear, which is the vital thing." *Artman* v. *Artman,* 111 Conn. 124, 126, 149 A. 246 (1930). The record adequately discloses that the plaintiff does claim to have an interest in real estate adverse to that of the defendant which she seeks to have determined and to protect.[2] That claim plainly falls within the "real action" exception of the Convention.

---

[2] The majority opinion in footnote 11 maintains that this ground for jurisdiction was not raised on appeal. The plaintiff's brief, however, concludes

I conclude therefore, that the trial court erred in failing to dismiss for lack of jurisdiction all of the plaintiff's claims that expressly invoke the authority of the court under our marital dissolution statutes to grant relief beyond the dissolution of the marriage itself, a remedy to which the defendant's waiver expressly assents. I agree with the majority that the trial court acquired jurisdiction under the complaint to determine the interest of the plaintiff in the Greenwich residence, unless that residence constitutes the "private residence of a diplomatic agent" under the Convention, a question to be resolved upon the remand. I disagree, however, with the implicit view of the majority opinion that the interest she presently possesses may somehow be enhanced as a result of the marital dissolution or that the court may assign all or part of the defendant's interest in the residence to her pursuant to § 46b-81.

Accordingly, I dissent in part.

its discussion of the *in rem* exception as follows: "The instant action, which has as an essential aspect thereof the adjudication of plaintiff's equitable rights *and even title ownership interest* in a piece of Connecticut real property falls squarely within the real property exception to the Vienna Convention." (Emphasis added.) In any event, "this court is not limited in its disposition of a case to claims raised by the parties and has frequently acted sua sponte upon grounds of which the parties were not previously apprised." *Greenwood* v. *Greenwood,* 191 Conn. 309, 315, 464 A.2d 771 (1983). This practice has commonly been followed with respect to jurisdictional issues such as those presented in this appeal. *Cahill* v. *Board of Education,* 198 Conn. 229, 238, 502 A.2d 410 (1985).