[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties to this action were married in Cleveland, Ohio, on August 12, 1957. At that time, the plaintiff wife ("wife") was a registered nurse and the defendant husband ("husband") was a practicing physician whose specialty was general surgery.1* The couple moved to Greenwich, Connecticut in 1962. They have three daughters, all now past the age of majority. Sometime after the relocation, the parties experienced marital difficulties, and the husband moved out of the family home to a rental unit. By that time, he had become well-established as a surgeon. The wife later instituted an action for dissolution of marriage in Connecticut on or about October 13, 1969. Both parties were represented in the legal process by very experienced and able legal counsel, who helped negotiate a settlement agreement dated February 10, 1971 ("agreement"). However, according to the testimony of the husband, the agreement divided most, but not all, of the marital estate. For instance, the wife retained title to the condominium in St. Croix, V.I., which had been placed in her sole name during the marriage, and was, therefore, omitted from the agreement. Nevertheless, the parties proceeded to judgment, not in Connecticut, but upon advice of counsel, in Mexico.[2] By agreement, the husband alone went to Juarez, Mexico to seek the divorce. The wife had authorized an appearance by local counsel on her behalf by virtue of a power of attorney. The husband had separate counsel. Neither party took steps to establish their domicile in Mexico prior to proceeding there. There, on February 16, 1971, judgment was entered and the agreement approved and incorporated by reference therein. The Connecticut action was then withdrawn. For his part, the husband testified that the court proceedings were conducted entirely in Spanish (a language in which he is not fluent), and that his recollection was that he was unrepresented at that time. While the attorney for the wife did, in fact, present the case, the record is clear that the husband also had local counsel present on his behalf. He also testified that there was a rush to get the hearing over with, and it is apparent from the testimony of both parties, that there was a substantial amount of emotion involved in the divorce process, particularly on the part of the CT Page 2304 wife. As an example, like a schoolgirl recounting with nostalgic relish some sophomoric prank, and as if the incident had just happened the day before and not more than thirty years ago, she testified that she purposely drove her car into that of the husband (a red jaguar) in the parking lot of the Greenwich Hospital, because she was angry with him.
Following his return from Mexico, the husband continued to pay the wife alimony and child support in accordance with their agreement. In brief, as long as he was employed as a physician, he was obligated to pay her a fixed sum of alimony dependent upon the number of minor children, together with a lump sum cost-of-living catch up to be paid in arrears early in the following year, which additional sum, as the years passed, became substantial. He stopped practicing as a physician in May 1997 at the age of 68. In addition, he was obligated to pay her an allowance for health insurance, maintain life insurance on his life with a face value of $83,000 for her benefit, to name the wife as beneficiary of one-third of his estate (less $83,000), and to name his children as beneficiaries of another one-third of his estate. As to the latter items, the evidence indicates that he still continues to do all four. The husband remarried in 1973, but the wife has not.
As part of the overall settlement, the husband retained an IRA of relatively modest value. In the years subsequent to the dissolution but prior to retirement, he contributed to this asset and other profit-sharing and retirement vehicles, long since consolidated into an entity known as Genesis Partners LP, having a current value in excess of $1,200,000. (Exhibit #16.) In 1998, he began making withdrawals from his pension/profit-sharing plan, and since 1999, he has done so in the amount of $10,000 per month. The wife asserts that she has a right to receive alimony based upon these withdrawals, in addition to his other income. The husband disputes this.
The agreement itself makes a clear distinction between alimony paid while the husband is engaged in his principal employment, and a situation referred to as "de-escalation" as set forth in an entirely separate section of the agreement which comes into play when he ceases his employment. The latter could occur for a variety of reasons, including retirement. Alimony paid during the former was a fixed amount regardless of his earnings, while upon retirement, after notice to the wife, the alimony was to be based upon a definition of "gross income" which is the subject of the present dispute. He was sixty-eight at the time of his retirement. According to the husband, he did, in fact, notify the wife of his impending retirement (Exhibit #19), and offered to work out things with her.[3] She ignored his suggestion. Again, in December 1996, the husband told the wife that she "better talk to her a lawyer. My lawyer is CT Page 2305 Attorney Amendola." She responded with a lawsuit. The husband eventually stopped making alimony payments pursuant to Article 4.A. of the agreement with the payment of $59,549 in 1998, and has made none since, other than the payment of his former wife's medical insurance premiums.
The wife attempted unsuccessfully to register the Mexican decree, and brought an action for contempt and other relief which action was dismissed. (See Memorandum of Decision de Dismissal dated July 5, 2000, Harrigan, J., 27 Conn.L.Rptr. 465.) She later brought another family action and a separate action for breach of contract. Following considerable procedural jockeying, the cases were consolidated. The court heard the parties and counsel over the course of five days.
The court is faced with two basic issues: (1) What effect, if any, to accord the Mexican decree, and (2) whether or not the withdrawals from the husband's retirement plan constitute gross income for purposes of the payment of alimony post-retirement.
 LAW AS TO THE MEXICAN DECREE
While a Superior Court has broad equitable powers in dealing with family relations matters, a proceeding to dissolve a marriage (along with its myriad collateral issues such as alimony, custody, and property division) is one in rem. Litvaitis v. Litvaitis, 162 Conn. 540, 545,295 A.2d 519 (1972); Fernandez v. Fernandez, 208 Conn. 329, 333,545 A.2d 1036 (1988), cert. denied, 493 U.S. 958, 110 S.Ct. 376,107 L.E.2d 361 (1989). The jurisdiction or power to entertain family relations matters is found in General Statutes § 46b-1. Amodio v.Amodio, 247 Conn. 724, 729 (1999). This court has already ruled that it has jurisdiction to hear this case under General Statutes § 46b-1
(15), and moreover that it intends to exercise its powers in connection therewith. (See Memorandum of Decision dated July 17, 2001, Shay, J.). Therefore, the question for this court is the extent, if any, to which it exercises those powers. Rosenfeld v. Rosenfeld, 61 Conn. App. 112, 116
(2000).
It has long been held in Connecticut that the rules of comity do not require a state to recognize or enforce every decree of a foreign nation, in particular, in the area of divorce, especially where the proceeding "offends the public policy of the state" or where "the foreign court lacked jurisdiction," such as where neither spouse has established a domicile in that country. Litvaitis, supra, 544-45. However, the courts have carved out some limited exceptions where, under the facts and CT Page 2306 circumstances of the particular case, equity demands recognition, even if the foreign decree is jurisdictionally invalid. This exception is known as the doctrine of "practical recognition." Bruneau v. Bruneau,3 Conn. App. 453, 457-58 (1985); Baker v. Baker, 39 Conn. Sup. 66, 71
(1983). The doctrine is normally applied to preclude one party from attacking the validity of the decree where, under all the circumstances, it would be inequitable to do so. Thus it has been referred to as a "rule of preclusion rather than a rule of resort." Deering v. Deering, Superior Court, J.D. Stamford/Norwalk, Docket No. 112348 (Oct. 4, 1991, Mottolese, J.) (5 Conn.L.Rptr. 117); Bruneau, supra, 457. Here, we have the situation where neither party contests the underlying judgment of dissolution, however, it is axiomatic that the parties cannot confer subject matter jurisdiction on the court by their agreement. Hayes v.Beresford, 184 Conn. 558, 563 (1981).
The question for this court then becomes, under the circumstances of this case, is it equitable and appropriate to grant practical recognition to the Mexican decree, including the agreement incorporated therein? This court believes that to give practical recognition to the Mexican decreefor the limited purpose of the dissolving of the marriage itself andnothing more is the more appropriate course. For if the court were to extend this ruling to the other orders, it would, in essence, be reversing its previous ruling regarding the domestication of a foreign judgment. Moreover, to do so would not only set a bad precedent, but would also violate the clear public policy of the State of Connecticut as articulated in General Statutes § 46b-66, which mandates first a review by the court of the agreement in order to determine if it is "fair and equitable," and if it is not, then to exercise its discretion to make such orders "as the circumstances require." It is this statutory process of incorporation which is the "safeguard for the public policy against collusive separation agreements." Hayes, supra, 567.
The uncontroverted testimony of the husband indicated that the Mexican proceedings were conducted entirely in Spanish, that he was not fluent in that language, and that the wife was not present in person. Moreover, no credible evidence was introduced that the Mexican court had before it the financial affidavits of the parties, or other evidence of their finances, so as to enable it to "inquire into the financial resources and actual needs" of the parties, much less any evidence of their fitness as parents. This court may, therefore, conclude that the necessary full and searching inquiry was not conducted by the Mexican court. Accordingly, the Mexican decree should only be granted limited practical recognition. The decree, including the agreement incorporated therein, having no force and effect as a Connecticut judgment, nor as a judgment recognized by the Connecticut court, except as to the dissolution of the marriage itself, CT Page 2307 this court lacks the power to grant relief thereon, such as modification or contempt. The inquiry thus shifts to the action to enforce the contract of the parties itself.
 AS TO WHAT CONSTITUTES "GROSS INCOME" FOR PURPOSES OF ALIMONY
Where, as here, a court lacks subject matter jurisdiction to enforce a foreign judgment incorporating therein an agreement of the parties, a party may choose to treat the matter as one in contract and to seek enforcement of the underlying agreement itself. Lasprogato v.Lasprogato, 127 Conn. 510, 514 (1941). Where such an action is instituted, the Connecticut Supreme Court has held that the court must be "guided by the general principles governing the construction of contracts." It went on to state that:
 A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms . . . Lawson v. Whitey's Frame Shop, 241 Conn. 678, 686, 697 A.2d 1137 (1997). Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law . . . Issler v. Issler, 250 Conn. 226, 235 (1999) (emphasis added).
In the interpretation of a contract, intent:
 . . . is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used. [Citations omitted.] This is so where the parties have their agreement in writing. [Citations omitted.] "In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." [citations omitted] Where the language CT Page 2308 of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings. [Citations omitted, emphasis added.] Barnard v. Barnard, 214 Conn. 99, 110 (1990).
Where the language "within the four corners of the instrument" is unambiguous, it is a question of law. Sullivan v. Sullivan,66 Conn. App. 501, 504 (2001); Sachs v. Sachs, 60 Conn. App. 337, 342
(2000). It is the language of the instrument which controls, and any secret meaning either party may have harbored is irrelevant. Sweeny v.Sweeny, 9 Conn. App. 498, 501 (1987). Likewise, as to one party's "subjective perception of the terms." Tallmadge Bros. v. Iroquois GasTransmission System, 252 Conn. 479, 498 (2000).
The court can also look to the circumstances of its execution. Baldwinv. Baldwin, 19 Conn. App. 420 (1989). Here, the parties had the benefit of able, experienced counsel in the negotiation and drafting of the agreement, which process took months if not years to complete.
At issue is the definition of the term "gross income" as found in Article 4.E.a) 4. of the agreement. The first three subparagraphs expressly pertain to the husband's income received as a physician, corporate profits from any corporation where he is employed, or any contribution "for the husband's benefit" (i.e. on his behalf) in a pension, profit-sharing, or deferred compensation plan. The fourth subparagraph, however, is a catchall which includes "any gross income from other sources including any monies paid from disability income policies." He is entitled to deduct from gross income "any actual cash losses" (as distinct from depreciation), "including, but not limited to, capital losses." Upon his retirement at age 65 or over, the children having reached their majority, his alimony obligation is capped at 40% of his gross income. There is no specific reference to types of income, including capital gains.
In conducting our analysis of the contract, it is important that it "be construed as a whole" and that "all relevant provisions" be considered together. Barnard, supra, 109; Sweeny, supra, 501. To that end, the court must also look at Article 2 which provides in relevant part:
 All personal property of the Husband, now held by him or hereafter which may come to him, shall be and remain his separate property, free from all rights of the wife. (Emphasis added.)
CT Page 2309
Clearly, from a reading of Article 4, the parties contemplated that the husband's alimony obligation would continue, in some form, post-retirement. The only question is the scope of the source of this obligation. However, when the Articles 2 and 4 are read together, this court is persuaded that gross income, for purposes of determining alimony under the terms of the agreement, does not include the husband's monthly withdrawals from the Genesis Partners LP account.
This finding is consistent with the most recent holdings of our Appellate Court in cases involving the analogous issue of the postjudgment modification of an alimony award pursuant to a judgment, where the court has also been asked to determine the meaning of the term income. In a case involving a motion for a postjudgment modification of an alimony order, the Appellate Court found error where the trial court, lacking continuing jurisdiction, "improperly considered property awarded to the defendant at the time of dissolution in computing his current income."Schorsch v. Schorsch, 53 Conn. App. 378, 384-85 (1999). In that case, the defendant had sold the real estate awarded to him at the time of the dissolution and was receiving principal payments. The court found the payments to him to be an "exchange of assets" and not to be included in the calculation of his income. Id. 386. This position is also consistent with other opinions, where the court has found that the "mere exchange of an asset awarded as property in a dissolution decree, for cash, the liquid form of the asset, does not transform the property into income."Denley v. Denley, 38 Conn. App. 349, 353 (1995); see also, Simms v.Simms, 25 Conn. App. 231, 234 (1991) [conversion of stock options]. Particularly instructive is the dissenting opinion of Judge Schaller in the case of Gay v. Gay, 70 Conn. App. 772, cert. granted, 261 Conn. 930
(2002). Indicating that he was "not persuaded" by the reliance of the majority on the "various dictionary and code [Internal Revenue Code] definitions" of "income," "capital gain," and "gross income," he went on to hold at pages 788-89, that:
 capital gain generated from an asset acquired subsequent to the dissolution is not income. While it is true that in this latter situation the asset was acquired after the dissolution, I reach this conclusion by further analogy to the principles cited previously. As our case law makes clear, a conversion of an asset from one form to another does not constitute the creation of income. Implicit in this conclusion is the underlying concept that the growth in value of the asset distributed at dissolution is not income when it is converted to another form. Rather, the growth, and resulting cash value when converted, simply represents the accrual in value of that asset itself. In other words, the category the item falls into, namely, either "capital asset" or "income," does not change because the assetCT Page 2310 has appreciated in value and then is converted as a matter of form.
(Emphasis added.)
The logic and reasoning of the foregoing cases should apply with equal force to the facts of this case. That way, we achieve a "common theme" in postjudgment matters whether or not they arise out of a matrimonial judgment or a contract. Bender v. Bender, 258 Conn. 733, 753 (2001). Here, the husband retained the modest retirement account as his share of the marital personal property. Through appreciation and further contributions, post-dissolution, this asset has grown considerably. During this period of contribution and appreciation, the husband was simultaneously meeting his alimony obligation. In essence, the wife has had the benefit of up-front dollars for her support in the form of alimony payments from the husband's then current income, and at the same time, the husband deferred the enjoyment of a portion of his remaining income until retirement. His systematic withdrawal of these funds from the Genesis Partner LP account at this time triggers a deferred income tax obligation. However, this court finds this to be an "accrual in value" of this asset, and not part of his gross income for calculating his ongoing alimony obligation, and the wife, with the advice of counsel, has effectively waived any right to share in this asset.
 FINDINGS
The court having heard the testimony of both parties, and having considered the evidence, finds as follows.
1. That it has jurisdiction to entertain the action pursuant to General Statutes § 46b-1 (15).
2. That the marriage of the parties was dissolved by decree of the First Civil Court of Bravos District, State of Chihuahua, Republic of Mexico, on February 16, 1971; that at the time of the entry of the decree neither party had established a domicile in Mexico; that the Mexican court lacked subject matter jurisdiction; that the courts of this state are not required to recognize said decree by way of comity; that neither party has challenged the effect of the decree in dissolving their marriage, and, in fact, each has acted in reliance thereon; and that under all the circumstances, it is equitable and appropriate that this court grant practical recognition solely to that portion of said decree which dissolved the marriage.
3. That prior to the entry of the Mexican decree dissolving the marriage of the parties, they entered into a Separation Agreement dated CT Page 2311 February 10, 1971; that the Mexican court incorporated same in its decree by reference; that it would violate the clear public policy of the State of Connecticut as set forth in General Statutes 46b-66 regarding the incorporation of such agreements into a decree, for this court, by way of comity, to enforce the provisions of said decree relating to same; that each of the parties had competent legal counsel during the negotiation of the separation agreement; that the separation agreement of the parties is a valid contract; and that this court should exercise its jurisdiction to interpret and enforce the terms thereof.
4. That based upon the testimony and evidence, the provisions of the agreement governing "de-escalation" are to be applied, including the definition of the term "gross income"; that the husband gave adequate notice to the wife of his imminent change of employment status; that the husband did, in fact, retire from the practice of medicine in 1997; that the agreement is clear and unambiguous; that the wife waived any rights in and to any personal property of the husband at the time of the dissolution or acquired thereafter; and that "gross income" does not include the husband's withdrawals from his retirement account, which are in the nature of an accrual in value of an asset retained by the husband at the time of the dissolution and/or acquired subsequent thereto.
5. That based upon the evidence before it, there is an undetermined sum due and owing to the wife under the terms of the agreement for the years 1998 through and including 2002 to date; that the court does not have sufficient credible evidence to make this determination of damages; and that it is equitable and appropriate that the court retain jurisdiction to make such a determination if the parties are unable to do so consistent with this opinion.
6. That the husband is in breach of the agreement in that there remains an undetermined amount of damages; that Article 20 of the agreement provides that should either party be in default that party shall pay thereasonable attorneys fees of the other; that the fees incurred by the wife in connection with this protracted legal action are all out of proportion to the results achieved, were largely unwarranted and unnecessary under all the circumstances; that since 1971, the husband has, in general, acted in good faith, consistent with the terms of the agreement, with the exception of what the court believes will be a relatively small amount of damages; that the award of attorneys fees is within the sound discretion of the court; and that under all the circumstances, it is equitable and appropriate to award the wife a limited amount of attorneys fees. Goold v. Goold, 11 Conn. App. 268,288-89 (1987). CT Page 2312
 ORDER
IN ACCORDANCE WITH THE FOREGOING, IT IS HEREBY ORDERED THAT:
1. Within sixty (60) days from the date hereof, the husband shall present to the wife a calculation of his outstanding obligation under the terms of the Separation agreement from and including January 1, 1998 to date, based upon 40% of his gross income as set forth therein,[4] and he shall, simultaneously therewith tender to the wife the full sum so calculated with due credit for any sums paid to date, and the court hereby reserves jurisdiction in the event of any dispute related thereto. His 1998 calculation shall not include the COLA catch up payment for 1997, which he made in 1998. In addition, he may exclude from his calculation of gross income his monthly Social Security payment, only if the Social Security payments to his former wife are based upon his past earnings record and not hers, otherwise, such payments are to be included.[5]
2. Within thirty (30) days from the date hereof, the husband shall tender to the wife the sum of $10,000 as and for her reasonable legal fees incurred herewith.
 THE COURT
SHAY, J.