# AVA M. TURNER *v.* ONNO J. FROWEIN
## (SC 16165)

McDonald, C. J., and Borden, Katz, Palmer and Callahan, Js.

Argued December 1, 1999—officially released May 17, 2000*

*Kenneth J. McDonnell*, for the appellant (defendant).

*John A. Reed*, with whom were *Wesley W. Horton* and *Susan P. Geenty*, for the appellee (plaintiff).

*Opinion*

KATZ, J. This case raises several issues on appeal. First, we must determine whether the trial court in this case improperly found, pursuant to article 13b of the Hague Convention on the Civil Aspects of International

---

* May 17, 2000, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

## Child Abduction (Hague Convention),[1] that the plaintiff

[1] The Hague Convention provides in relevant part: "The States signatory to the present Convention,

"Firmly convinced that the interests of children are of paramount importance in matters relating to their custody,

"Desiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access,

"Have resolved to conclude a Convention to this effect, and have agreed upon the following provisions—

"CHAPTER 1
"SCOPE OF THE CONVENTION
"Article 1

"The objects of the present Convention are—

"a to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

"b to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

"Article 2

"Contracting States shall take all appropriate measures to secure within their territories the implementation of the objects of the Convention. For this purpose they shall use the most expeditious procedures available.

"Article 3

"The removal or the retention of a child is to be considered wrongful where—

"a it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

"b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

"The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

"Article 4

"The Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights. The Convention shall cease to apply when the child attains the age of 16 years.

"Article 5

"For the purposes of this Convention—

"a 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place

had proven by clear and convincing evidence that the

of residence;

"b 'right of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

## "CHAPTER II
## "CENTRAL AUTHORITIES
### "Article 6

"A Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities.

"Federal States, States with more than one system of law or States having autonomous territorial organizations shall be free to appoint more than one Central Authority and to specify the territorial extent of their powers. Where a State has appointed more than one Central Authority, it shall designate the Central Authority to which applications may be addressed for transmission to the appropriate Central Authority within the State.

### "Article 7

"Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.

"In particular, either directly or through any intermediary, they shall take all appropriate measures—

"a to discover the whereabouts of a child who has been wrongfully removed or retained;

"b to prevent further harm to the child or prejudice to interested parties by taking or causing to be taken provisional measures;

"c to secure the voluntary return of the child or to bring about an amicable resolution of the issues;

"d to exchange, where desirable, information relating to the social background of the child;

"e to provide information of a general character as to the law of their State in connection with the application of the Convention;

"f to initiate or facilitate the institution of judicial or administrative proceedings with a view to obtaining the return of the child and, in a proper case, to make arrangements for organizing or securing the effective exercise of rights of access;

"g where the circumstances so require, to provide or facilitate the provision of legal aid and advice, including the participation of legal counsel and advisers;

"h to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child;

"i to keep each other informed with respect to the operation of this Convention and, as far as possible, to eliminate any obstacles to its application.

## "CHAPTER III
## "RETURN OF CHILDREN

defendant had sexually abused his son. We conclude

"Article 8

"Any person, institution or other body claiming that a child has been removed or retained in breach of custody rights may apply either to the Central Authority of the Child's habitual residence or to the Central Authority of any other Contracting State for assistance in securing the return of the child. . . .

"Article 9

"If the Central Authority which receives an application referred to in Article 8 has reason to believe that the child is in another Contracting State, it shall directly and without delay transmit the application to the Central Authority of that Contracting State and inform the requesting Central Authority, or the applicant, as the case may be.

"Article 10

"The Central Authority of the State where the child is shall take or cause to be taken all appropriate measures in order to obtain the voluntary return of the child.

"Article 11

"The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.

"If the judicial or administrative authority concerned has not reached a decision within six weeks from the date of commencement of the proceedings, the applicant or the Central Authority of the requested State, on its own initiative or if asked by the Central Authority of the requesting State, shall have the right to request a statement of the reasons for the delay. If a reply is received by the Central Authority of the requested States, that Authority shall transmit the reply to the Central Authority of the requesting State, or to the applicant, as the case may be.

"Article 12

"Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

"The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

"Where the judicial or administrative authority in the requested State has reason to believe that the child has been taken to another State, it may stay the proceedings or dismiss the application for the return of the child.

"Article 13

"Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes

that the trial court's finding was proper. Second, we

its return establishes that—

"a the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

"b there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

"The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

"In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

"Article 14

"In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

"Article 15

"The judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention, where such a decision or determination may be obtained in that State. The Central Authorities of the Contracting States shall so far as practicable assist applicants to obtain such a decision or determination.

"Article 16

"After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice.

"Article 17

"The sole fact that a decision relating to custody had been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, but the judicial or adminis-

must discern the scope of the trial court's authority under article 13b to deny a petition to return a child once it has been determined that the child would be subject to a grave risk of harm if returned to his or her home country under the care of the petitioning parent. We conclude that, in exercising its authority under article 13b, a trial court must evaluate the full range of placement options and legal safeguards that might facilitate the child's repatriation under conditions that would ensure his or her safety, thereby preserving the home country's jurisdiction over the underlying custody dispute without endangering the child. We conclude further that, in this case, the trial court did not conduct a complete article 13b analysis. Finally, we must determine whether the trial court, in declining to honor a temporary order of custody rendered by a foreign court, violated the Uniform Child Custody Jurisdiction Act (UCCJA)[2] and principles of comity. We conclude that

trative authorities of the requested State may take account of the reasons for that decision in applying this Convention.

"Article 18

"The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time.

"Article 19

"A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.

"Article 20

"The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. . . ." Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (entered into force for United States on July 1, 1988).

[2] The UCCJA is codified at General Statutes § 46b-90 et seq. General Statutes § 46b-91 provides in relevant part: "Purposes of act; construction of provisions. (a) The general purposes of this chapter are to: (1) Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being; (2) promote cooperation with the courts of other states to the end that a custody decree is rendered in a state which can best decide the case in the interest of the child; (3) assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection,

the trial court's judgment in this respect was proper.

training and personal relationships is most readily available, and that courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state; (4) discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child; (5) deter abductions and other unilateral removals of children undertaken to obtain custody awards; (6) avoid relitigation of custody decisions of other states in this state insofar as feasible; (7) facilitate the enforcement of custody decrees of other states; (8) promote and expand the exchange of information and other forms of mutual assistance between the courts of this state and those of other states concerned with the same child; and (9) make uniform the laws of the states which enact The Uniform Child Custody Jurisdiction Act. . . ."

General Statutes § 46b-93 provides in relevant part: "Jurisdiction. (a) A court of this state shall have jurisdiction to make a child custody determination by initial or modification decree if: (1) This state (A) is the home state of the child at the time of commencement of the proceeding, or (B) had been the child's home state within six months before the commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or (2) it is in the best interest of the child that a court of this state assume jurisdiction because (A) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training and personal relationships; or (3) the child is physically present in this state and (A) the child has been abandoned or (B) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or (4) (A) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivisions (2) or (3) of this subsection, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (B) it is in the best interest of the child that this court assume jurisdiction. . . ." In 1995, the language of § 46b-93 (a) was changed from "the Superior Court" to "a court of this state." See Public Acts 1995, No. 95-316, § 10. For clarity, we refer to the current revision of the statute.

General Statutes § 46b-96 provides in relevant part: "Simultaneous proceedings in other states. (a) A court of this state shall not exercise its jurisdiction under this chapter if at the time of filing the petition a proceeding concerning the custody of the child is pending in a court of another state exercising jurisdiction substantially in conformity with this chapter, unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons. . . ."

Therefore, we reverse the judgment of the trial court and remand the case for further proceedings.

The record establishes the following pertinent facts. The plaintiff, Ava M. Turner, a United States citizen, married the defendant, Onno J. Frowein, then a Dutch

General Statutes § 46b-98 provides: "Jurisdiction declined by reason of petitioner's reprehensible conduct. (a) If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct, the court may decline to exercise jurisdiction if it is just and proper under the circumstances.

"(b) Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state, the court may decline to exercise its jurisdiction if it is just and proper under the circumstances.

"(c) In appropriate cases, a court dismissing a petition under this section may charge the petitioner with necessary travel and other expenses, including attorneys' fees, incurred by other parties or their witnesses."

General Statutes § 46b-103 provides: "Recognition of out-of-state custody decrees. The courts of this state shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this chapter or which was made under factual circumstances meeting the jurisdictional standards of this chapter, so long as this decree has not been modified in accordance with jurisdictional standards substantially similar to those of this chapter."

General Statutes § 46b-104 provides in relevant part: "Modification of custody decree of another state. (a) If a court of another state has made a custody decree, a court of this state shall not modify that decree unless (1) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this chapter or has declined to assume jurisdiction to modify the decree and (2) the court of this state has jurisdiction. . . ."

General Statutes § 46b-113 provides: "International application. The general policies of this chapter extend to the international area. The provisions of this chapter relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons."

citizen, in Connecticut in 1985. The parties lived apart throughout a significant portion of their marriage, dividing their residence between New York City, where the plaintiff was sporadically employed as a senior executive in the international banking industry, and Connecticut, where the defendant owned a home. The couple's only child was born in June, 1990. The plaintiff assumed the role of primary caregiver, living in New York with the child during the week and commuting to Connecticut on the weekends.

The court found that the marriage had been fraught with multiple episodes of violence and emotional abuse inflicted by the defendant on the plaintiff. In support of this finding, the court reasonably relied on evidence indicating that the defendant repeatedly had verbally abused the plaintiff by way of the recitation of ongoing racial epithets, insults against her physical appearance, and disparaging remarks concerning her intelligence.[3] In the child's presence, the defendant also had choked the plaintiff on at least one occasion, attempted to push her down a flight of stairs on another occasion, and twice spat in her face.

Inevitably, the child became a direct victim of these altercations. On one occasion in January, 1994, following a heated argument between the couple in which the plaintiff had indicated her intention to file for divorce, the defendant retaliated by taking the child without informing the plaintiff of his whereabouts. He later telephoned the plaintiff to inform her that, as punishment for wanting a divorce, she would never see her son again. The plaintiff sought court intervention in securing her son's return, and obtained a restraining order

---

[3] The plaintiff's testimony detailed the extent of the defendant's verbal abuse: "He called me nigger. Told me I was stupid. He spit at my face in front of [the child] twice and in front of our neighbors. Said I was fat. That I was dumb. That I was old. It goes on. They were always laced with profanities."

against the defendant. The defendant ultimately returned with the child, at which time the couple attempted a reconciliation on the condition that the defendant obtain counseling.

In May, 1994, the family moved to Holland. Prior to the move, the plaintiff had insisted that the defendant commit, in writing, to provide financial support for her and the child in Holland, and to allow her to return to the United States as needed to secure employment.[4] Once in Holland, however, the defendant exercised exclusive control over the family finances and forbade the plaintiff access to his bank account. At the same time, the defendant continued to abuse the plaintiff both physically and verbally.

Shortly after moving to Holland, the defendant began taking the child to sleep alone with him in a bedroom on the ground floor of the marital home. On the morning of February 7, 1996, the plaintiff discovered the child sleeping naked from the waist down with the defendant. When confronted by the plaintiff, the defendant insisted that he did not know the whereabouts of the child's pajama bottoms. The plaintiff later found them buried in the sheets. The plaintiff immediately accused the defendant of sexually abusing the child, at which time an argument ensued. That same morning, the defendant moved out of the house and began living in an apartment directly behind the marital home. The defendant nevertheless regularly entered the plaintiff's home without permission, even after she had changed the locks.

By July, 1997, the plaintiff had secured an offer of employment in New York and informed the defendant

---

[4] The plaintiff testified that her prospects for securing employment in Holland were extremely limited due to both her female and minority status, as well as Dutch laws that place substantial limitations on the ability of nonDutch citizens to obtain full employment. Joan Vilardi, president of the American Women's Club International Network, also testified to the lack of business opportunities available to minority women in Holland, and the workplace hostility faced by minority female executives.

of her intentions to take the child to the United States to meet her prospective employer. In retaliation for not being asked to accompany them, the defendant removed the child's passport and birth certificate from the plaintiff's home, took the child for a second time without the plaintiff's permission, and again threatened not to return him. The plaintiff summoned the police and relayed her suspicions that the defendant was sexually abusing the child. Despite assurances that a child abuse officer would be dispatched to her home the next day, no officer arrived.[5] The defendant did not return the child until ten days later.

On July 28, 1997, the plaintiff instituted divorce proceedings in the District Court of the Hague, and sought permission to relocate with her minor child to the United States during the pendency of the proceedings. A hearing was scheduled for September 4, 1997. The plaintiff, however, who had been in New York to arrange for the child's schooling, had not received notice of the hearing until the evening before. Although she had departed for Holland immediately, the plaintiff arrived midway through the proceedings and did not have the opportunity to prepare with her attorney. On the witness stand, the plaintiff testified to her opinion that the defendant was "not a bad father," and that he loved the child, but that she nonetheless sought to return to the United States so that the child could enroll in school before the start of the new year. The plaintiff previously had informed her attorney about her suspicions that the defendant was sexually abusing the child and had assumed that those allegations had been presented to the court prior to her late arrival. Her attorney, however, had not raised those allegations before the court. Moreover, although the proceedings were conducted in

---

[5] The plaintiff testified that, when she finally did speak to a child abuse officer in September, 1997, the officer was unaware that she had made a prior report of abuse.

Dutch, the plaintiff, who speaks only rudimentary Dutch, testified in English.

On September 11, 1997, the Hague District Court denied the plaintiff's request to transfer the child to the United States, and issued a provisional order granting temporary custody to the defendant. The order did not provide for visitation by the plaintiff. The court also ordered the Dutch child care and protection board to investigate the best interest of the minor child and the best "provisional arrangement for parental access."

By this time, the defendant's violent episodes had intensified. On September 14, 1997, when the plaintiff went to the defendant's apartment begging to see the child to explain to him the court's order, the defendant began choking and kicking the plaintiff, inflicting a beating so severe that she subsequently required a hysterectomy. Like the previous violent incidents, the child witnessed this beating.

Thereafter, the plaintiff filed a petition for modification with the Hague District Court, claiming that the defendant had been abusing both her and the child. At the hearing on this petition conducted on October 30, 1997, the court declined to consider witness testimony and supporting exhibits offered by the plaintiff to corroborate her accusations of abuse on the ground that the defendant had not been provided with an opportunity to respond to that evidence. The court thereby affirmed the provisional order entrusting temporary custody to the defendant, pending an investigation by the child care and protection board of the plaintiff's claims of abuse.

Also on October 30, prior to receiving notice of the court's decision, the plaintiff unilaterally withdrew her divorce petition based upon assurances by the defendant that he would release the child into her custody. Before doing so, the plaintiff had been advised by coun-

sel that withdrawing the action would vacate the custody decree issued on September 11, 1997. That same day, the plaintiff departed with the child for the United States.

On November 11, 1997, the plaintiff commenced this action for the dissolution of her marriage. Upon receiving notice of the action, the defendant filed a "Petition for Return of Child" pursuant to the Hague Convention and its implementing legislation, the International Child Abduction Remedies Act; 42 U.S.C. § 11601 et seq.; and filed a "Declaration" under the UCCJA. The plaintiff objected, denying that the taking of the child had been wrongful. Additionally, she affirmatively alleged that, given the allegation of sexual abuse, an order returning the child to Holland under the defendant's care would pose a grave risk of physical and psychological harm.

In June, 1998, a hearing was held solely on the issue of the defendant's petition for the child's return. In support of the plaintiff's allegation that the defendant had been sexually abusing the child, the court considered the following evidence.

In addition to testifying that she had found the child, half-clad, in bed with the defendant, the plaintiff testified that the child had made statements to her concerning "two secrets" that he had kept with the defendant, which the child stated he could not share because he would "get in trouble." On those occasions when the child had returned from an overnight stay with the defendant, the child appeared anxious and was afraid to disrobe. According to the plaintiff, the child had confided in her that during those visits, he had been sleeping with his father every night, and that his "daddy had hurt him."

In addition, the court considered a letter by Nancy Arann, a psychotherapist in New York who had examined the child during one of the plaintiff's visits to the

United States. The letter confirmed that the plaintiff had related her suspicions of sexual abuse to Arann as early as the summer of 1996, while the plaintiff and child were still residing with the defendant in Holland. The letter also recommended that the child continue with therapy in Holland. The defendant, however, refused to offer his consent to such treatment.[6]

Several medical experts and social services professionals also testified at the hearing, including John Leventhal, director of Yale University's School of Medicine child sexual abuse clinic. Leventhal, who had examined the child on two occasions—once on November 12, 1997, less than two weeks after the child had arrived in the United States, and again on December 31, 1997—concluded that, based upon a reasonable degree of medical probability, the child had been sexually abused. His conclusion was based on his own physical examination of the child, as well as on the information included in the written report of Tracey Bombaci, a clinical social worker and colleague of Leventhal's who had counseled the child on four separate occasions.[7]

Leventhal testified that the child's physical examination had indicated "some troublesome findings" that, in his opinion, were "suggestive of anal abuse."[8] Leventhal

[6] The plaintiff testified that, under the Dutch medical system, consent to psychiatric treatment requires a referral from the child's family doctor and an agreement from both parents.

[7] Although Bombaci did not testify at trial, her report was admitted into evidence as the foundation for Leventhal's conclusion that the child probably had been the victim of sexual abuse.

[8] Leventhal offered the following testimony to elaborate on the specific findings that had led him to conclude that the child had been sexually abused: "Normally, when an anal exam is done there are—the border of the anus has normal, smooth—excuse me, normal anal folds that show a light pattern to them. Also, they come together in [an] anterior/posterior linea[r] kind of pattern.

"And there were four abnormalities or four findings that I noted. The first was that the anal folds were flattened. The second, the area had a funneled appearance to it. Third, the anus was dilated, which is not [un]usual by itself in the position that we have the child. However, the dilation was quite irregular in the border.

also testified that the plaintiff had told him that she was still wiping her son's anus. Leventhal added that, because at that time the child was seven and one-half years old, he found that fact to be "unusual." Although Leventhal offered no opinion as to who might have committed the abuse, when the incident might have taken place, or where it might have occurred, he did testify that the child's condition was consistent with a chronic injury that would likely persist for months following a sexual assault.

With respect to Bombaci's written report, Leventhal testified that he found certain findings in the report particularly persuasive, including the extreme anger that the child harbored against the defendant, and the fact that "[h]e was very preoccupied with hurting [the defendant's] genitals." Indeed, Bombaci's report indicated that "a repeated theme in [the child's] conversations was violence towards males, particularly [the defendant]. His focus was on inflicting pain, including hitting, kicking, and squeezing male genitalia." During one particular session, the child reported a desire to "kick [the defendant's] private part," and to "give him cancer in his private so they cut it out and he won't hurt anyone anymore." The report also indicated that, when directly confronted with the issue of sexual abuse, the child's affect was "consistent with a child who is fearful and embarrassed." Leventhal was also concerned that when asked by Bombaci to describe the defendant, the child responded, "I don't like to tell."

Keith Roeder, the court-appointed psychologist, also testified. Roeder, who had examined the child on several occasions between March, 1997, and June 3, 1997, testified that, although the child had initially responded to an inquiry regarding sexual abuse with answers that

"And fourth, there was a large fissure or abnormality in the interior portion. All of those, I thought, were unusual in a child of this age."

indicated that he had been hit by the defendant, the child had stated on subsequent visits that "my father put his penis in my butt hole four times." Roeder explained further that, even though the child became distracted and evasive when asked to explain those statements, he elaborated somewhat with the use of anatomically correct dolls.[9] According to Roeder, the child's ability to express himself through role-play "raise[d] the possibility in my mind of this actually happening." Roeder ultimately determined that although his assessment of the child fell in the inconclusive range, he "certainly also cannot say, based on those interviews, that sexual abuse did not occur."

Roeder also had examined the defendant, and concluded that he "had a tendency toward aggressive behavior. That he may act out inappropriately and aggressively. . . . [T]hat it was as possible for a person with that profile to act in an assaultive manner toward others." The defendant's violent tendencies shaped the child's relationship with him. Roeder testified that the child was anxious and "very afraid" of the defendant, and that these emotions had not been influenced by the plaintiff. Accordingly, Roeder opined that the child likely would suffer substantial psychological harm if forced to return to his father's care.

[9] On this point, Roeder testified as follows: "I then continued to ask him questions about the sexual experience he had told me about in his father's apartment. He then told me that he actually did not remember that, that he slept through that, that he was never awake during the incident he described to me. And that he only knew that that had happened because his father told him the next day that that had happened.

"I also asked as part of this interview, since [the child] had elaborated to show me what he was talking about by use of tools. [The child] placed a large, larger in relative size, male doll on top of a small [child]-like doll back-to-back in a position that one would assume that would be appropriate for that kind of inappropriate sexual contact.

"And he placed them together. And I asked him what was happening and he said that the penis was being put into the butt hole. I said, 'How's that happening, can you show me?' He looked at the dolls on top of one another and he said, 'That's it.' "

The court also heard testimony from Andrea L. Mortati, a psychologist employed at the child's elementary school in the town of Westport, who had been counseling the child since November, 1997. According to Mortati, the child had indicated to her, as well as to several children in his classroom, that "my father put his penis into my butt hole." The trial court found that these statements were made "under circumstances which were not shown to be interrogative in nature . . . ." Moreover, Mortati testified that the child had told her repeatedly that he did not want to speak with or see his father, and that, because he feared that his father would discover his whereabouts, he kept a knife at home for protection.

Finally, the trial court heard testimony from Jeanine Eaton, the couple's former neighbor in Connecticut, and host to the plaintiff and the child during their visits to the United States. Eaton testified that during one of these visits, the child, while overlooking the home where he used to live with his parents, spontaneously declared: "I'm going to buy me a big dog to bite my daddy's penis off."

In a memorandum of decision dated June 25, 1998, the trial court denied the defendant's petition, and rendered judgment for the plaintiff. The court made several findings integral to its decision. The court explicitly found that the defendant had met his burden of establishing that the child "was a habitual resident of Holland," and that at the time of removal, the defendant had been "exercising de jure parental and custodial rights . . . ." Implicit in the trial court's findings, therefore, is its conclusion that the child had been wrongfully removed from his home country in violation of the Hague Convention. The court also found, however, that "it has been established, in total, by clear and convincing evidence, that the father has sexually abused this child."

The trial court made no express findings as to whether the child safely might be returned to Holland under an alternative care arrangement, or whether the Dutch legal system was capable of ensuring the child's protection. The court did find, however, that "the child has developed a strong bond with his mother and any severing of that bond or lack of [the] most frequent contact with his mother would cause severe psychological damage to this child." The court also found that, although the plaintiff had been earning from $85,000 to $200,000 per year working as a senior executive in the international banking industry in New York, "in Holland, [her] capacity to obtain substantial employment was severely limited not only by her female minority status but also by Dutch laws that place substantial limitations on the ability of nonDutch citizens to obtain full-time employment in Holland." In addition, the trial court found that, although it could not ascertain whether the plaintiff would, "at this time," face prosecution in Holland for child abduction, she "would be subjected to some official sanctions should she return to Holland."[10] Finally, the court found that the plaintiff "entertained and presently entertains a substantial fear of the [defendant]."

Pursuant to its authority under article 13b, the court declined to order the child's return on the ground that such return "would cause grave risk of physical and psychological harm to him." The defendant appealed to the Appellate Court from the trial court's judgment.[11] Pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2, the appeal was transferred to this court.

The defendant claims on appeal that: (1) the plaintiff failed to establish by clear and convincing evidence

---

[10] The plaintiff had testified at trial that after she had left Holland, civil proceedings continued, in which a fine was levied against her pending the return of the child. That fine was subsequently vacated.

[11] The defendant had filed a motion to reargue dated July 8, 1998, which the court granted on August 17, 1998, but denied the relief requested.

that he had sexually abused his child; (2) in declining to order the child's return to Holland under the defendant's care, the trial court improperly failed to consider whether the judicial authorities in that country would be unwilling or unable to protect the child upon his return; and (3) the trial court improperly failed to honor the initial custody determination issued by the Dutch court as required by the UCCJA and principles of comity.

As to the defendant's first claim, we conclude that, based upon the testimony offered at trial, the trial court properly found that the plaintiff had proven by clear and convincing evidence that the defendant had sexually abused his son. As to the defendant's second claim, our analysis is not limited to the single consideration raised thereby, namely, whether the trial court is required to evaluate the capacity of the judicial authorities in the home country to protect the child upon his repatriation before denying a petition seeking the child's return to the petitioning parent. Because article 13b requires that a trial court take into account "information relating to the social background of the child," we undertake a broader examination of the full scope of the trial court's authority to deny a petition under article 13b. With respect to that issue, we conclude that, before a trial court may properly deny a petition for the return of a child under article 13b, it must consider the full panoply of alternative care arrangements and legal safeguards that might facilitate the child's safe repatriation, as well as the capacity of the home country's judicial authorities to enforce any such arrangement. In the present case, the trial court did not conduct an appropriate analysis under article 13b. Finally, we conclude that the trial court did not violate the UCCJA or principles of comity by refusing to honor the initial decree rendered by the Dutch court.

I

We first address the defendant's claim that, in denying his petition seeking the return of his child under the Hague Convention, the trial court improperly concluded that the plaintiff had proved, by clear and convincing evidence, that he had sexually abused his child.[12] The defendant acknowledges that there was evidence, in specific, Leventhal's opinion, to support a finding that the child had been sexually abused, but argues that there was insufficient evidence to support the trial court's finding that the defendant had committed the abuse. We reject this claim.

The Hague Convention, to which both the United States and Holland are signatories, establishes the legal rights and procedures for the prompt return of minor children wrongfully removed or kept from their country of habitual residence. Under the Hague Convention, a parent, or other individual or institution, who claims that a child has been wrongfully removed may seek assistance from the "Central Authority" of any signatory nation in securing the voluntary return of the child. See Hague Convention, supra, arts. 8 through 10. As an alternative, under those circumstances wherein the abducting parent refuses to cooperate, the party seek-

---

[12] The defendant does not challenge the assumption that a grave risk of harm exists in cases wherein a parent is found to have sexually abused a child. Indeed, the interpretive guidelines issued by the United States Department of State establish that the sexual abuse of a child by a parent constitutes a grave risk of harm under article 13b. The guidelines provide as follows: "An example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the [Hague] Convention, the court may deny the petition. Such action would protect the child from being returned to an 'intolerable situation' and subjected to a grave risk of psychological harm." Pub. Notice 957, 51 Fed. Reg. 10,494, 10,510 (1986). The defendant asserts only that the trial court's finding to that effect, under the circumstances of this case, was not supported by clear and convincing evidence.

ing the child's return may commence judicial proceedings to obtain an order for the child's return. Id., art. 12.

Under article 3 of the Hague Convention, the removal of a child is "wrongful" when: "it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and . . . at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. . . ." Upon finding that the removal was wrongful, the court "shall order the return of the child forthwith," unless one of the narrow exceptions set forth in the Hague Convention applies. Id., art. 12; see 42 U.S.C. § 11601 (a) (4). Under the article 13b exception, a trial court in the state of refuge may exercise its discretion to retain a child when the person opposing the child's return establishes, by clear and convincing evidence, "a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." See also 42 U.S.C. § 11603 (e) (2) (A).

On appeal, we review a trial court's finding that a parent has sexually abused a child in accordance with the rules that apply generally to a trier's findings of fact. "We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole record. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling. . . . *In re Jessica M.*, 49 Conn. App. 229, 235–36, 714 A.2d 64, cert. granted, 247 Conn. 915, 722 A.2d 806 (1998)." (Citations omitted; internal quota-

tion marks omitted.) *In re Eden F.*, 250 Conn. 674, 705–706, 741 A.2d 873 (1999).

Our review of the record reveals that the evidence credited by the trial court supports its conclusion that the plaintiff had demonstrated by clear and convincing evidence that the defendant had sexually abused his son. The trial court's conclusion rests on the testimony of several experts, including Leventhal, who, after conducting more than one examination, opined that the child, in all likelihood, had been sexually abused. Indeed, Leventhal concluded that the child's injuries were indicative of a sexual assault that had occurred months prior to the examinations. The trial court was free to credit that finding and infer therefrom that the abuse took place at a time when the child was still residing in Holland with the defendant. See id., 707 (crediting testimony of experts who had spent "considerable amount of time" evaluating subject's parental fitness); *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 667, 420 A.2d 875 (1979) ("[p]sychological testimony from professionals is rightly accorded great weight").

Two additional experts, Roeder and Mortati, testified to the child's direct statement that "my father put his penis in my butt hole . . . ."[13] Bombaci, the child's social worker, had documented the child's preoccupation with male genitalia, and his desire to give his father "cancer in his private so they cut it out and he won't hurt anyone anymore." Eaton, the child's former neighbor,

---

[13] The defendant emphasizes that Roeder's own findings regarding sexual abuse were inconclusive, even after he had reviewed the physical findings documented by Leventhal. We find this seeming contradiction to be of little import. The trial court had the benefit of live testimony from each of these experts, and, as the trier of fact, was free to credit each expert's testimony with the weight it deemed appropriate. *State* v. *Blades*, 225 Conn. 609, 629, 626 A.2d 273 (1993). Moreover, as stated previously, the child's willingness to elaborate on his assertions through role-play persuaded Roeder that he could not definitively rule out the possibility that the child had been sexually assaulted.

substantiated the child's intense hatred of his father by testifying to the child's statement that he wanted to "buy me a big dog to bite my daddy's penis off." Coupled with Leventhal's physical evidence of abuse, it was reasonable for the trial court to have inferred that the child's obsession with mutilating the defendant's genitalia is a direct outgrowth of having been sexually assaulted by him.

Finally, the plaintiff testified that in addition to discovering the child, naked from the waist down, in bed with the defendant, she had discerned a marked change in his behavior upon his return from overnight stays with the defendant, including an uncharacteristic hesitation to disrobe. According to the plaintiff, the child had confided in her, while they were still residing in Holland, that the defendant had "hurt him," and that he had been keeping "two secrets" with the defendant that he was afraid to reveal. These events gave rise to the plaintiff's suspicion of abuse as early as 1996, further substantiating the inference drawn by the trial court that the child had been victimized by the defendant.[14]

[14] The defendant appears to argue that the plaintiff's failure to raise the issue of sexual abuse before the Hague District Court at the initial September 4, 1997 hearing, as well as the lack of documentation to corroborate her assertion that she had had the child examined in Holland on February 7, 1996, following her discovery of him in bed with the defendant, suggests that she ultimately fabricated her allegation as a pretext for abducting the child. The trial court, however, expressly found that prior to that hearing, "the [plaintiff] had made claims and allegations both to the [defendant] and to the police that the [defendant] had sexually abused the child," but that "[h]er claims did not result in any action taken by the police, nor did the Dutch court accord to those claims any credibility." There is ample evidence on the record to support the trial court's conclusion, including the plaintiff's own testimony, Arann's memorandum, and the Dutch decision of October 30, 1997, wherein the court declined to consider the plaintiff's supporting exhibits on the ground that "these were not discussed at the hearing and the parties have not had the opportunity to respond to them." As the trier of fact, it is within the sole province of the trial court to weigh and interpret the plaintiff's credibility. See *W.* v. *W.*, 248 Conn. 487, 495, 728 A.2d 1076 (1999). We find nothing in the record that would justify our interference with the trial court's assessment.

That the child himself did not testify to the fact of sexual abuse is of no moment given the quantum of evidence that ties the defendant to the assault. See *In re Carissa K.*, 55 Conn. App. 768, 781–82, 740 A.2d 896 (1999) (absent testimony from eight year old victim, trial court's decision to terminate parental rights supported independently by expert testimony). When that evidence is weighed in the aggregate, we cannot conclude that the trial court was clearly erroneous in concluding that the plaintiff had demonstrated by clear and convincing evidence that the defendant had sexually abused his son.

II

We next consider whether the trial court improperly denied the defendant's petition under article 13b. According to the defendant, the sole basis for the trial court's decision to deny his petition was its finding that, because the defendant had sexually abused the child, the child would be subject to a grave risk of harm if returned to Holland under the defendant's supervision. The defendant maintains, however, that article 13b requires the trial court to consider whether the judicial authorities in the child's home country are capable of ensuring the child's protection. The plaintiff counters that the trial court may properly deny a petition once it has determined that the child has been the subject of abuse by the petitioning parent and, therefore, the trial court's focus on whether the defendant had sexually abused his son was proper. As stated previously, we consider not only the claim presented by the defendant, but rather, the full scope of the trial court's authority under article 13b. We conclude that before a trial court may properly deny a petition under article 13b, it must evaluate the full range of placement options and legal safeguards that might facilitate the child's repatriation under conditions that would ensure his or her safety, thereby preserving the home country's

jurisdiction over the underlying custody dispute without endangering the child. We further conclude that the trial court did not undertake such an analysis in denying the defendant's petition.

## A

Whether the trial court properly applied the article 13b exception to the Hague Convention involves statutory interpretation, which is a question of law. Therefore, our review of this issue is plenary. See *Babcock* v. *Bridgeport Hospital*, 251 Conn. 790, 819, 742 A.2d 322 (1999); *Lopiano* v. *Lopiano*, 247 Conn. 356, 363, 752 A.2d 1000 (1998).

As stated previously, a trial court is authorized under article 13b to deny a petition for the child's return upon a showing, by clear and convincing evidence, that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Our task, therefore, is to determine whether a finding that the child would be subject to a grave risk of harm if returned to the petitioning parent is, without more, sufficient to justify a trial court's decision to decline to order the child's return to his or her country of habitual residence. In doing so, we are mindful of the overarching conviction that inheres in the Hague Convention itself, that is, in adjudicating matters under the Hague Convention, "the interests of the child are stated to be the guiding criterion . . . ." E. Perez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session (1980) p. 432, para. 25 (Perez-Vera Report).[15]

---

[15] As the official conference reporter for the Hague Convention, Perez-Vera's interpretation is instructive. "Her explanatory report is recognized by the Conference as the official history and commentary on the [Hague] Convention and is a source of background on the meaning of the provisions of the [Hague] Convention . . . ." Pub. Notice 357, 51 Fed. Reg. 10,494, 10,503 (1986). As the Supreme Court has noted, "[b]ecause a treaty ratified by the United States is not only the law of this land . . . but also an agreement among sovereign powers, we have traditionally considered as

We are respectful as well of the two universally recognized principles that emanate from this conviction. First, by acceding to the Hague Convention, signatory nations have expressed the commitment "to protect children internationally from the harmful effects of their wrongful removal or retention." Hague Convention, supra, preamble. Thus, the Hague Convention generally favors repatriation as a means of restoring the preabduction status quo and of deterring parents from crossing international boundaries in search of a more sympathetic forum. See, e.g., *Ohlander* v. *Larson*, 114 F.3d 1531, 1534 (10th Cir. 1997) (function of Hague Convention "is meant to provide for a child's prompt return once it has been established the child has been 'wrongfully removed' "); *Feder* v. *Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995) (Hague Convention "designed to restore the 'factual' status quo which is unilaterally altered when a parent abducts a child"); *Nunez-Escudero* v. *Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995) (confirming goal of restoring status quo and deterring international forum shopping); see also Pub. Notice 957, 51 Fed. Reg. 10,494, 10,509 (1986). For the same reason, the trial court's adjudicative authority under the Hague Convention extends to the abduction claim itself, but not the merits of the underlying custody dispute, which, inevitably, involves matters more appropriately addressed by authorities in the child's home country. See, e.g., *Nunez-Escudero* v. *Tice-Menley*, supra, 377 ("[i]t is not relevant to this [Hague] Convention exception who is the better parent in the long run"); *Rydder* v. *Rydder*, 49 F.3d 369, 372 (8th Cir. 1995) (Hague Convention "does not require an ad hoc determination of the underlying merits or a balancing of the equities"); see also Hague Convention, supra, art. 19 ("[a] decision

aids to its interpretation the negotiating and drafting history (travaux preparatoires) and the postratification understanding of the contracting parties." (Citation omitted.) *Zicherman* v. *Korean Air Lines Co.*, 516 U.S. 217, 226, 116 S. Ct. 629, 133 L. Ed. 2d 596 (1996).

under this [Hague] Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue").

Second, as a deterrent mechanism, the success of the Hague Convention depends, in large part, on a narrow construction of its exceptions. See 42 U.S.C. § 11601 (a) (4). As explained in the Perez-Vera Report, "the [Hague] Convention as a whole rests upon the unanimous rejection of this phenomenon of illegal child removals and upon the conviction that the best way to combat them at an international level is to refuse to grant them legal recognition. The practical application of this principle requires that the signatory States be convinced that they belong, despite their differences, to the same legal community within which the authorities of each State acknowledge that the authorities of one of them—those of the child's habitual residence—are in principle best placed to decide upon questions of custody and access. As a result, a systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the [Hague] Convention by depriving it of the spirit of mutual confidence which is its inspiration." Perez-Vera Report, supra, pp. 434–35, para. 34. We therefore proceed with an understanding that, although, in rare instances, the removal of a child from his or her home country is justified by objective reasons, under the Hague Convention, the home country remains the forum best equipped to adjudicate conflicts relating to a child's long-term care and custody.

B

Although this appeal presents a case of first impression for this court, we note that recently, in *Blondin* v. *Dubois*, 189 F.3d 240, 249–50 (2d Cir. 1999), the Second Circuit Court of Appeals concluded that, before a trial

court properly can decline to order the return of an abducted child under article 13b, it must undertake a complete analysis of protective arrangements and legal safeguards that might allow the safe repatriation of the child pending a final custody determination by a court with proper jurisdiction.

*Blondin* involved allegations of physical abuse against a father who had petitioned the trial court for an order that his children be returned to France under his care. Id., 243. The trial court denied the petition pursuant to article 13b, and the father appealed. Id. On appeal, the court held that "[a]mple record evidence supported the trial court's factual determination regarding the risk of physical abuse that the children would face" if ordered to return to France under the father's custody. Id., 247. Mindful, however, that the " 'whole structure of the Convention' depended on the institutions of the abducted-to state generally deferring to the forum of the child's home state"; id., 248; the court held that the trial court improperly had denied the petition after having considered only the single placement option initially suggested by the father. Id., 249. According to the court, a proper article 13b analysis requires a thorough examination of "any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation." Id., 248. Thus, on remand, the trial court was instructed to evaluate "the full panoply of arrangements that might allow the children to be returned to [France] . . . in order to allow courts of that nation an opportunity to adjudicate custody." Id., 242.

In general, we look to the federal courts for guidance in resolving issues of federal law. See, e.g., *Joo* v. *Capitol Switch, Inc.*, 231 Conn. 328, 332–36, 650 A.2d 526 (1994) (considering federal court precedent to interpret fed-

eral statute); see also *Schnabel* v. *Tyler*, 230 Conn. 735, 743 and n.4, 646 A.2d 152 (1994) (noting that court looks to Second Circuit precedent when interpreting federal statute). Decisions of the Second Circuit Court of Appeals, although not binding on us, are particularly persuasive. "In deciding to adopt the analysis of the Second Circuit Court of Appeals, we recognize that the decisions of the federal circuit in which a state court is located are entitled to great weight in the interpretation of [an international convention]. This is particularly true in [Hague Convention] cases, where the [convention] confers concurrent jurisdiction on the federal and state courts. It would be a bizarre result if this court [required the trial court to make particular findings under article 13b] when in another courthouse, a few blocks away, the federal court, being bound by the Second Circuit rule, required [alternative findings]. . . . We do not believe that when Congress enacted the concurrent jurisdiction provisions of [42 U.S.C. § 11601 et seq.] that it intended to create such a disparate treatment of plaintiffs depending on their choice of a federal or state forum." (Citation omitted; internal quotation marks omitted.) *Schnabel* v. *Tyler*, supra, 743 n.4; see also *Red Maple Properties* v. *Zoning Commission*, 222 Conn. 730, 739 n.7, 610 A.2d 1238 (1992). Accordingly, we are persuaded to follow *Blondin's* lead and conclude that, in exercising its authority to deny a return petition under article 13b, following its determination of abuse, the trial court must conduct a thorough analysis of ameliorative measures, including whether the child safely might be returned under the care of the parent defending against the petition or another appropriate third party, and whether the judicial authorities of the child's home country are capable of enforcing those measures, thereby eliminating the harm that the child might otherwise face upon repatriation.

Important to our analysis is the fact that, although the Hague Convention requires the immediate return

of an abducted child to the country of his or her habitual residence, it does not specify the logistics of the return. Accordingly, we agree with the Second Circuit that, "[i]n the exercise of comity that is at the heart of the [Hague] Convention (an international agreement, we recall, that is an integral part of the 'supreme Law of the Land,' U.S. Const., art. VI), we are required to place our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it. See, e.g., *Friedrich* [v. *Friedrich*], 78 F.3d [1060, 1068 (6th Cir. 1996)]." *Blondin* v. *Dubois*, supra, 189 F.3d 248–49. By requiring that a trial court comply "both with the [Hague] Convention's mandate to deliver abducted children to the jurisdiction of the courts of their home countries and with the [Hague] Convention's command that children be protected from the 'grave risk' of harm"; id., 242; the approach taken in *Blondin* respects the home country's jurisdictional authority without sacrificing the physical and emotional well-being of abducted children.

In addition, exceptions to the general rule favoring repatriation are to be narrowly construed. As stated in *Blondin*, an overly broad construction of a trial court's authority to grant exceptions under article 13b would frustrate a paramount purpose of the Hague Convention, namely, to discourage international forum shopping in matters pertaining to child custody. See id., 246; see also *Friedrich* v. *Friedrich*, supra, 78 F.3d 1064; *Feder* v. *Evans-Feder*, supra, 63 F.3d 221. Indeed, such a construction would encourage other signatory states to decline to consider whether temporary arrangements are available in the United States in cases of American children abducted to those foreign nations. As the Second Circuit noted, "[t]he careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American children abducted to other nations—

whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection." *Blondin* v. *Dubois*, supra, 189 F.3d 242; see also *Currier* v. *Currier*, 845 F. Sup. 916, 923 (D.N.H. 1994) ("[t]he letter and spirit of the [Hague] Convention obligate this court to respect Germany's authority to resolve the underlying custody dispute to the same extent we rely upon German courts to respect like custody decisions made by courts in the United States"). The treaty, properly enforced, should ensure that, when children from the United States are abducted to any one of the treaty countries, the courts of that country will not make their own determinations regarding custody without first considering the ability and willingness of the United States to protect its own children. In this regard, the trial court's authority under article 13b, when exercised pursuant to a thorough examination of placement options and legal remedies available in the home country, effectively nullifies much of the incentive a parent might otherwise have for harboring an abducted child in a state of refuge with an eye toward obtaining a favorable custody determination from a foreign tribunal.

Finally, the decision in *Blondin* is in accord with a number of federal and state court decisions wherein a variety of elements factored into the trial court's analysis under article 13b, including whether a child might be repatriated under the supervision of either the parent defending against a return petition or an appropriate third party, and whether any remedial orders that might be necessary to ensure the child's safety would be enforceable under the home country's legal system. See, e.g., *Friedrich* v. *Friedrich*, supra, 78 F.3d 1069 (article 13b requires finding that court in home country "may be incapable or unwilling to give the child adequate protection"); *Nunez-Escudero* v. *Tice-Menley*, supra, 58 F.3d 377 (analysis under article 13b includes assess-

ment of home jurisdiction's civil stability, availability of tribunal to entertain custody complaint, and environment in which child might reside upon return to home country); *Currier* v. *Currier*, supra, 845 F. Sup. 923 (exception entails evaluation of "safety, propriety, or nurturing character of the German environment to which the children would return"); *Tahan* v. *Duquette*, 259 N.J. Super. 328, 335, 613 A.2d 486 (1992) (article 13b inquiry includes examination of jurisdiction to which child will be returned and "the basic personal qualities of those located there"); *In re Petition for Coffield*, 96 Ohio App. 3d 52, 57, 644 N.E.2d 662 (1994) (article 13b requires that trial court evaluate "the basic environment which presently exists in Australia and the basic nature of the individuals [other than the petitioner] with whom [the child] would live").[16]

---

[16] We recognize that other courts have reached contrary conclusions. For example, the court in *Steffen F.* v. *Severina P.*, 966 F. Sup. 922, 927–28 (D. Ariz. 1997), declined to order the child's return to his father in Germany based solely on its finding that the child, having fostered an extraordinary emotional dependence on his mother, would suffer irreparable psychological damage if separated from her for an extended period. In so doing, the court rejected the father's contention that bonding and attachment issues do not rise to the level of a grave risk of harm under article 13b, "absent an additional finding that the court in the country of the child's habitual residence is incapable or unwilling to give the child adequate protection." Id., 927. Instead, the court held that " 'specific evidence of potential harm' to a child as a result of separation from a primary caregiver may constitute [a] grave risk of harm," irrespective of the mother's ability to return with the child, or the home country's ability to remedy the situation pending a final custody adjudication. Id. In fact, the court neglected to examine either alternative. The court's ultimate decision to deny the child's return was expressly predicated on the sole fact "that [the child] has attached and bonded to his mother and is likely to suffer detachment and unbonding should he be removed from her." Id., 928. Similarly, in *Rodriguez* v. *Rodriguez*, 33 F. Sup. 2d 456, 462 (D. Md. 1999), the court accepted the mother's grave risk of harm defense based on evidence that the father frequently and severely had physically abused the child. The court ultimately denied the father's return petition without exploring the prospect of arranging an alternative placement for the child, or the home jurisdiction's capacity to enforce such an arrangement. Id., 461–62. In light of the contrary approach taken by the Second Circuit Court of Appeals in *Blondin*, a court of particularly persua-

On the basis of our analysis of *Blondin*, as well as the aforementioned cases supporting the approach taken in that case, we conclude that, under article 13b, a trial court must consider the range of placement options and enforceable remedies that might facilitate the child's safe return pending a custody award in due course by the home court with proper jurisdiction.[17]

sive authority; see part II B of this opinion; we decline to follow the analysis in *Steffen F.* and *Rodriguez.*

[17] We are mindful that reliance on the fundamental tenets of statutory construction might support a conclusion that the availability of alternative placement options and enforcement mechanisms in the child's home country is, for the most part, irrelevant to the trial court's authority under article 13b to deny a return petition. In specific, article 3 of the Hague Convention instructs that the "law of the State in which the child was habitually resident" serves as the referent for determining whether the child's removal is in breach of another's rights of custody such that the removal of the child is considered wrongful. The absence of a similar reference in article 13b reasonably might be interpreted as reflecting the drafters' intent that the trial court need not consult the laws of the habitual country in exercising its authority to deny a petition for the return of a child. See *Biasetti* v. *Stamford,* 250 Conn. 65, 76, 735 A.2d 321 (1999) (absence of limiting language reflects legislative intent when contrasted with inclusion of limiting language in related provisions). Further support for that conclusion might be found in the Hague Convention's official commentary, which provides plainly that, although the Hague Convention creates a system of "close co-operation" among the judicial and administrative authorities of the signatory nations, "[its] references to the law of the State of the child's habitual residence are of limited significance, since the law in question is taken into consideration *only so as to establish the wrongful nature of the removal . . . .*" (Emphasis added.) Perez-Vera Report, supra, p. 435, para. 36. Finally, the interpretive guidelines issued by the United States Department of State regarding the meaning of the grave risk of harm exception make no reference to the home country's ability to protect the child. See footnote 12 of this opinion.

As stated previously, however, we do not write on a clean slate in discerning the scope of the trial court's authority under article 13b, but are guided by the persuasive authority of *Blondin* v. *Dubois,* supra, 189 F.3d 240. Moreover, we consider the approach taken by the Second Circuit in that case to take adequate account of the equally significant tenet of construction that the provisions of international conventions should be interpreted "in the light of [their] object and purpose. 1 Restatement (Third), The Foreign Relations Law of the United States (1987) § 325." *Fernandez* v. *Fernandez,* 208 Conn. 329, 340, 545 A.2d 1036 (1988), cert. denied, 493 U.S. 958, 110 S. Ct. 376, 107 L. Ed. 2d 361 (1989).

That inquiry includes, but need not be limited to, an examination of whether the child could be returned under the supervision of the parent defending against the petition or under the custody of an appropriate third party, and whether the jurisdiction to which the child would be returned is capable of enforcing the remedial conditions of the return order. Indeed, if an alternative arrangement would allow the child to be returned to the home country without effectively relinquishing the child to the custody of the abusive parent, so long as appropriate legal mechanisms exist to enforce such an arrangement, the risk of harm that might otherwise be associated with granting the petition might well be eliminated. Finally, although the trial court is obligated to consider the relevant placement options and enforcement mechanisms articulated herein, the trial court retains the discretion to accord the weight it deems appropriate to the criteria that will inform its analysis.

## C

Having concluded that the trial court must evaluate the full range of placement options and legal safeguards that might facilitate the child's safe return, we must determine whether, in denying the defendant's petition under article 13b, the trial court's analysis in this case was adequate. We are mindful in conducting this analysis that, under the Hague Convention, the plaintiff bears the heavy burden of establishing the applicability of the article 13b exception by clear and convincing evidence.

In issuing its memorandum of decision, the trial court did not have the benefit of the decision in *Blondin*, which was released subsequent to the decision in this case. The trial court did, however, cite to the case of *Panazatou* v. *Pantazatos*, Superior Court, judicial dis-

trict of Hartford-New Britain at Hartford, Docket No. 960713571 (April 29, 1997), wherein the court, in an interim memorandum of decision regarding the court's jurisdiction under the Hague Convention, upon finding that the child would suffer long-term psychological harm if separated from his mother, deferred its decision on the father's petition pending a "full investigation and decision," on whether the mother would face contempt charges if she accompanied the child to Greece, whether she was financially capable of supporting herself and the child in that country, and whether any proposed undertakings would be legally enforceable in that country. Its recognition that the *Panazatou* court "considered the circumstances which would be faced by the child and mother if they returned to Greece" suggests that the trial court understood the need to consider the circumstances that the plaintiff and child in the present case would face if they returned to Holland. See *Fitzgerald* v. *Fitzgerald*, 190 Conn. 26, 32, 459 A.2d 498 (1983) (inferring that referee considered relevant criteria in awarding counsel fees in light of memorandum's general reference to controlling case law). Such supposition would also be consistent with our practice of reading a trial court's findings under a presumption that the court has engaged in a proper analysis. See *Bornemann* v. *Bornemann*, 245 Conn. 508, 539, 752 A.2d 978 (1999) (trial court's findings demonstrate proper interpretation of statute despite lack of express reference to statutory factors); *Barnes* v. *Barnes*, 190 Conn. 491, 493–94, 460 A.2d 1302 (1983) (evidence presented at trial supports issuance of financial order in absence of express finding by trial court regarding statutory criteria). Nevertheless, for the reasons articulated herein, the court's examination of similar considerations in the present case fell short of satisfying the core requirements of an article 13b analysis.

In its memorandum of decision, the trial court properly recognized that, given its finding of sexual abuse, ordering the child to return to the defendant in Holland would subject the child to a grave risk of harm. Additionally, the trial court explicitly found that "the child has developed a strong bond with [the plaintiff] and any severing of that bond or [the] lack of most frequent contact with [the plaintiff] would cause severe psychological damage to this child." The trial court expressly found, from the evidence presented, that the plaintiff's "capacity to obtain substantial employment [in Holland] was severely limited not only by her female minority status but also by Dutch laws that place substantial limitations on the ability of non-Dutch citizens to obtain full-time employment in Holland." It also found that, although it could not ascertain whether the plaintiff would face prosecution in Holland for child abduction, "there certainly is basis in the evidence for the [plaintiff's] fears that she would be subjected to some official sanctions should she return to Holland." Finally, the trial court found that the plaintiff "entertained and presently entertains a substantial fear of the [defendant]."

These findings, however, standing alone, do not justify the trial court's decision to decline to order the child's return to Holland under the provisional care of the plaintiff or an appropriate third party. Nothing in the record indicates that the trial court examined whether the defendant was capable of providing adequate financial support and a separate residence for the plaintiff and child upon their return as a means of compensating for the plaintiff's limited employment prospects in Holland. Although this arrangement had been proposed jointly by the attorney for the child and his guardian ad litem, it cannot be said that the trial court assessed the viability of this option when the plaintiff, whose burden it was to prove the absence of alternative provisional care arrangements, failed to

introduce evidence pertaining to the defendant's financial situation.

Moreover, although the trial court found that the plaintiff entertained a present fear of the defendant in light of his history of abusive behavior, nothing in the record indicates that the trial court investigated whether preventative remedies, such as ordering no contact and issuing restraining orders, are enforceable under the Dutch legal system.[18] Similarly, the trial court neglected to investigate the plaintiff's fear that she would be subject to some type of official sanction if she returned to Holland. Upon further evaluation, that concern might have been addressed by assurances from Dutch authorities regarding their intent not to pursue sanctions. Finally, even if circumstances prevented the plaintiff from returning with the child, there is nothing in the record to indicate that the trial court considered whether expedited custody proceedings would minimize the separation period, thereby mitigating any psychological trauma that the child ultimately might experience if he were to be placed under the care of an alternative third party.

In short, the trial court offered no explanation for why the child should not be returned to Holland in the temporary custody of some appropriate and suitable party, other than the defendant, with adequate guarantees of child protection. As the court in *Blondin* recognized, "granting [the defendant's] petition would not— as a legal matter—invariably entail turning the [child]

---

[18] The only evidence in this regard was a letter from a Dutch attorney, admitted by agreement of the parties, which suggests that it is not possible to obtain a no contact order under Dutch law, and that such an order, if issued by a foreign tribunal, cannot be maintained. The letter provides, however, that under unusual circumstances, there may be an ability to obtain a court order forbidding someone from coming onto a particular street, and to get assistance from the police if that order is violated. The court in the present case did not explore the viability of such legal safeguards in determining whether the child and the plaintiff could be returned safely.

over to his custody. In fact, other arrangements might be available that would allow the [child] to return to [Holland] in some other person's care, pending a long-term custody adjudication—thus reducing or eliminating the risk of harm that might otherwise be associated with granting [the defendant's] petition." *Blondin* v. *Dubois*, supra, 189 F.3d 249.

Under the circumstances presented, we think it appropriate to remand this matter to the trial court for further consideration of the range of placement options and legal remedies that might allow the child to return to Holland with adequate safeguards for his protection, pending a final custody determination in due course by a Dutch court with proper jurisdiction. The drafters of the Hague Convention fully understood that the removal of a child from his or her home country is sometimes justified by objective reasons, and that in rare instances, a child's immediate reintegration into his or her habitual environment could prove dangerous. By virtue of its limited exceptions, therefore, the Hague Convention confers upon the adjudicating authority the discretion to retain the child in the state of refuge. Article 13b, in specific, "clearly derive[s] from a consideration of the interests of the child." Perez-Vera Report, supra, p. 433, para. 29. Therefore, on remand, the trial court should exercise its broad equitable discretion to develop a thorough record to facilitate its decision. In evaluating the suitability of available options, the trial court is free to make any appropriate or necessary inquiries of the government of Holland by, inter alia, requesting the aid of the United States Department of State, which can communicate directly with the government of that country. We trust that on remand, these proceedings will be conducted with the speedy dispatch that is contemplated by the Hague Convention. See Hague Convention, supra, art. 11.

We emphasize that we do not disturb or modify the trial court's finding that returning the child to the defendant would expose him to a "grave risk" of harm, within the meaning of article 13b. Thus, if the trial court remains unable to find any reasonable means of repatriation that would not effectively place the child in the defendant's immediate custody, either expressly or de facto, it should deny the petition under the Hague Convention.

## III

The defendant's final claim is that under the UCCJA and principles of comity, the trial court was required to honor the initial temporary order of custody rendered by the Dutch court on September 11, 1997. Specifically, the defendant maintains that in declining to order the child's return pursuant to the grave risk of harm exception of article 13b, the trial court, in effect, improperly ignored that decree and substituted its own contrary findings of fact for the findings of the Dutch court. We disagree.

## A

"As one of its stated purposes, the [UCCJA] seeks to '[a]void jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being.' General Statutes § 46b-91 (a) (1) . . . . The [UCCJA] hopes to 'deter abductions . . . assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection; [and] avoid relitigation of custody decisions of other states . . . .' General Statutes § 46b-91 (a) . . . . [The UCCJA] expressly provides that '[t]he courts of this state shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions

substantially in accordance with this chapter.' General Statutes § 46b-103." (Citations omitted.) *Agnello* v. *Becker*, 184 Conn. 421, 426–27, 440 A.2d 172 (1981). The general principles of the UCCJA extend to the international arena, and the provisions pertaining to the recognition and enforcement of custody decrees of other states apply to custody decrees rendered by appropriate authorities of other nations. See General Statutes § 46b-113; see also *Goldstein* v. *Fischer*, 200 Conn. 197, 199, 510 A.2d 184 (1986).

Common-law comity principles compel a similar rule of deference and respect to foreign judgments, including those relating to child custody. "[J]udgments of courts of foreign countries are recognized in the United States because of the comity due to the courts and judgments of one nation from another. Such recognition is granted to foreign judgments with due regard to international duty and convenience, on the one hand, and to rights of citizens of the United States and others under the protection of its laws, on the other hand." *Litvaitis* v. *Litvaitis*, 162 Conn. 540, 544, 295 A.2d 519 (1972). Based on this principle, an award of child support granted in one country by a court having jurisdiction to do so will be given full force and effect in another country. See id., 544–45.

In this case, there was no foreign custody order that the trial court was required to recognize because the initial Dutch decree awarding temporary custody to the defendant had been rendered inoperative when the plaintiff unilaterally withdrew her divorce action. See Netherlands Code of Civil Procedure § 826.[19] Moreover,

[19] In a decision rendered on February 13, 1998, the Hague District Court confirmed that "the provisional arrangements become void by virtue of section 826, paragraph 2 of the (Dutch) Code of Civil Procedure as soon as the petition for divorce is withdrawn. As the [plaintiff] has withdrawn her petition for divorce, the provisional arrangements have, consequently, become void." Additionally, in the trial court, the plaintiff offered evidence in the form of a sworn statement by her counsel in Holland testifying to the fact that under Dutch law, "provisional relief ceases to be operative as

in addressing the plaintiff's allegation of sexual abuse against the child, the trial court did not substitute its own findings of fact for those of the Hague District Court because that issue had not been litigated previously. In denying the plaintiff's modification petition, the Hague District Court reasoned that the original decree rendered on September 11, 1997, awarding the defendant temporary custody of the child, had not been predicated on any "incorrect or incomplete information" regarding the issue of sexual abuse because that issue had not been presented to the court. When the plaintiff did raise the allegation of abuse for the first time during the course of the proceeding at which the modification petition was considered, the Dutch court declined to evaluate independently the supporting evidence because the defendant had not had the opportunity to respond. Thus, in light of the fact that the issue of sexual abuse had not been litigated by the Dutch court, we conclude that the trial court did not improperly undertake to adjudicate the plaintiff's article 13b defense.

The judgment is reversed and the case is remanded for further proceedings.

In this opinion the other justices concurred.

---

soon as a divorce petition is withdrawn. The provisional relief granted by the Hague District Court has therefore ceased to be operative." Moreover, the defendant's argument that the plaintiff's withdrawal did not take effect until the morning of October 31, 1997, and that, therefore, the custody order would have been enforceable by the defendant at the moment that the plaintiff had left the country, has no bearing on whether that order continued to be operative at the time when the plaintiff initiated this dissolution action in the trial court on November 11, 1997. The question of whether the plaintiff wrongfully removed the child from his habitual residence is distinct from whether the trial court improperly declined to honor the Hague District Court's decree.